IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| EVER BEDOYA, DIEGO GONZALES, and MANUEL DeCASTRO, on behalf of themselves and all others similarly situated, | : : : : : : | 2:14-cv-02811-ES-JAD |
|  | : | Motion Day:  October 7, 2019 |
| Plaintiffs, | : : |  |
| v. | : : |  |
| AMERICAN EAGLE EXPRESS, INC. d/b/a AEXGroup., | : : : |  |
| Defendant. | : : : |  |

**PLAINTIFFS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**

Dated:  September 13, 2019

R. Andrew Santillo
Mark J. Gottesfeld
WINEBRAKE & SANTILLO, LLC
Twining Office Center, Suite 211
715 Twining Road
Dresher, PA 19025

Harold Lichten*
Matthew Thomson*
LICHTEN & LISS RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114

*Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

I.    FACTUAL BACKGROUND................................................................3

   A.    AEX's General Operations..................................................3

   B.    AEX's Uniform Independent Contractor Classification......................4

   C.    AEX's Use of the Standardized Transportation Brokerage Agreement ("TBA")................................................................6

   D.    Plaintiffs and Class Members Performed their Work Within AEX's Usual Course of Business and Usual Place of Business (Prong B)................................................................7

   E.    AEX's Right to Control Class Members' Work (Prong A)..................9

       1.    Tracking Couriers through AEX's "Stop-Level Dispatch Control."................................................10

           a.    Courier Manifests ..............................................11

           b.    Customer Commit Time .................................11

           c.    Handheld Scanning Devices to Record Progress ..........12

           d.    Rockhopper and AEXTrack ...........................13

       2.    Security and Compliance Audit Process.............................14

           a.    Screening of Courier Applicants .....................14

           b.    Route Orientation for Couriers .......................15

           c.    Covert Field Audits .................................15

           d.    Courier Review / Remediation .......................17

       3.    Additional Company-Wide Restrictions on Couriers...........17

i

F.      Class Members Did Not Operate "Independently Established" Businesses (Prong C) ............................................................18

G.      AEX's Uniform Policy of Making Deductions to Couriers' Pay and Failing to Pay Couriers Overtime Premium Compensation.........20

II.     The Definition of an "Employee" under New jersey wage Laws is Expansive and suitable for classwide resolution. ...........................................22

A.      Plaintiffs' Claims are Governed by the "ABC" Test Set Forth in *Hargrove v. Sleepy's*, which Places the Burden on AEX to Show that the Couriers are not Employees ...................................................22

B.      AEX's Common Policies and Procedures Permit the Court to Make Categorical Determinations regarding Plaintiffs' Claims.........23

III.    The Court Should Grant Class Certification ................................................26

A.      Ascertainability ..................................................................27

B.      Numerosity ........................................................................29

C.      Commonality ......................................................................30

D.      Typicality..........................................................................31

E.      Adequacy..........................................................................32

F.      Predominance ....................................................................33

G.      Superiority ........................................................................38

IV.     Conclusion ...................................................................................40

### TABLE OF AUTHORITIES

**Cases**

Acosta v. Scott Labor LLC,
 2006 WL 27118 (N.D. Ill. Jan. 3, 2006) .............................................................25

Ansoumana v. Gristede's Operating Corp.,
 201 F.R.D. 81 (S.D.N.Y. 2001)..........................................................................26

Baby Neal v. Casey
 43 F.3d 48 (3d Cir. 1994) ............................................................................ 30, 31

Badia v. HomeDeliveryLink, Inc.,
 2015 WL 5666077 (D.N.J. Sept. 25, 2015)..........................................................33

Bedoya v. American Eagle Express, Inc.
 914 F.3d 812 (3d. Cir. 2019) ..............................................................................33

Bouder v. Prudential Fin., Inc.,
 2009 WL 4576056 (D.N.J. Dec. 2, 2009) ...............................................................3

Brandon v. 3PD, Inc.,
 2014 WL 11348985 (N.D. Ill. Oct. 20, 2014).......................................................25

Byrd v. Aaron's Inc.,
 784 F.3d 154 (3d Cir. 2015) ......................................................................... 27, 28

Cannon v. Cherry Hill Toyota, Inc.,
 184 F.R.D. 540 (D.N.J. 1999) .............................................................................33

Carr v. Flowers Foods, Inc.
 2019 WL 2027299 (E.D. Pa. May 7, 2019) ................................................ passim

City Select Auto Sales v. BMW Bank of N. Am. Inc.,
 867 F.3d 434 (3d Cir. 2017) ...............................................................................27

Costello v. BeavEx, Inc.
 810 F.3d 1045 (7th Cir. 2016)................................................................ 24, 36, 37

Craig v. FedEx Ground Package System, Inc.
 686 F.3d 423 (7th Cir. 2012) ................................................................................2

D'Annunzio v. Prudential Ins. Co. of Am.
192 N.J. 110 (2007) ..........................................................................7

DaSilva v. Border Transfer of MA, Inc.
2019 WL 1927869 (D. Mass. May 1, 2019) .......................................25

De Giovanni v. Jani-King Int'l, Inc.,
262 F.R.D. 71 (D. Mass. 2009) ................................................ 23, 26

Hargrove v. Sleepy's, LLC
220 N.J. 289 (2015) ................................................................. passim

In re Cmty. Bank of N. Va.,
622 F.3d 275 (3d Cir. 2010) ............................................................27

In re Fedex Ground Package System, Inc.
2007 WL 3027405 (N.D. Ind. Oct. 15, 2007) ..................................35

In re Ins. Brokerage Antitrust Litig.,
579 F.3d 241 (3d Cir. 2009) ............................................................34

In re Warfarin Sodium Antitrust Litig.,
391 F.3d 516 (3d Cir. 2004) ............................................................33

In re: Prudential Insurance Co. America Sales Practice Litig.
148 F.3d 283 (3d Cir. 1998) ...................................................... 38, 39

Ladegaard v. Hard Rock Concrete Cutters, Inc.,
2001 WL 1403007 (N.D. Ill. Nov. 9, 2001) .....................................25

Martins v. 3PD, Inc.,
2013 WL 1320454 (D. Mass. Mar. 28, 2013) ........................ 25, 36, 37

Nationwide Mut. Ins. Co. v. Darden,
503 U.S. 318 (1992) .......................................................................23

Neff v. Flowers Foods, Inc.
No 15-254, slip op. (D. Vt. May 16, 2019) .................................. 25, 29

O'Brien v. Encotech Constr. Servs., Inc.,
203 F.R.D. 346 (N.D. Ill. 2001) ......................................................26

Overka v. American Airlines, Inc.,
     265 F.R.D. 14 (D. Mass. 2010) ............................................................39

Phelps v. 3PD, Inc.,
     261 F.R.D. 548 (D. Or. 2009).............................................................26

Reyes v. Netdeposit, LLC
     802 F.3d 469 (3d Cir. 2015) ...............................................................30

Reynolds v. City Express, Inc.,
     2014 WL 1758301 (Mass. Super. Jan. 8, 2014)..................................25

Rivet v. Office Depot, Inc.,
     207 F. Supp. 3d 417 (D.N.J. 2016).............................................. 34, 38

Rodriguez v. National City Bank
     726 F.3d 372 (3d Cir. 2013) ...............................................................30

Rubinsky v. Zayat
     2015 WL 3517629 (D.N.J. June 4, 2015) .............................................3

Sagar v. Fiorenza,
     2014 WL 5489938 (Mass. Super. Ct. Jan. 18, 2014) ..........................26

Sandoval, et al. v. M.J.F. Bowery Corp. d/b/a/ Ten's Show Club,
     29 Mass. L. Rptr. 11 (Mass. Super. Ct. July 22, 2011) .......................26

Scovil v. FedEx. Package Sys., Inc.
     886 F. Supp. 2d 45 (D. Me. 2012)......................................................30

Sherman, et al. v. American Eagle Express, Inc.
     2:09-cv-00575-JS (E.D. Pa.) .................................................................5

Soto v. Diakon Logistics (Delaware), Inc.,
     2013 WL 4500693 (S.D. Cal. Aug. 21, 2013).....................................26

Spates v. Roadrunner Transportation Sys., Inc.,
     2016 WL 7426134 (N.D. Ill. Dec. 23, 2016) ................................ 25, 37

Spellman v. Express Dynamics, LLC,
     150 F. Supp. 3d 378 (D.N.J. 2015).......................................................3

Spellman, et al. v. American Eagle Express, Inc.
    2:10-cv-01764-JS (E.D. Pa.) ..................................................................5

Stewart v. Abraham
    275 F.3d 220 (3d Cir. 2001) ................................................................29

Szczubelek v. Cendant Mortgage Corp.,
    215 F.R.D. 107 (D.N.J. 2003) .............................................................32

Thomas v. Matrix Corp. Servs., Inc.,
    2012 WL 3581298 (N.D. Ill. Aug. 17, 2012)................................. 23, 25

Tyson Foods, Inc. v. Bouaphakeo,
    136 S. Ct. 1036 (2016)........................................................................34

Vargas v. Spirit Delivery & Distribution Servs., Inc.,
    2017 WL 1115163 (D. Mass. Mar. 24, 2017) ......................... 25, 37, 38

Wal-Mart Stores, Inc. v. Dukes
    131 S. Ct. 2541 (2011)........................................................................30

Williams v. Jani-King of Philadelphia, Inc.
    837 F.3d 314 (3d Cir, 2016) ..................................................... 7, 24, 34

Williams v. Sweet Home Healthcare, LLC,
    325 F.R.D. 113 (E.D. Pa. 2018) ..........................................................28

**Statutes**

N.J. Stat. § 34:11-56a25.1...........................................................................3

N.J. Stat. §34:11-4.2..............................................................................1, 22

N.J. Stat. §34:11-4.4..............................................................................1, 22

N.J. Stat. §34:11-56a(4) .........................................................................1, 3

N.J.S.A. § 2A:14-1.....................................................................................3

N.J.S.A. §43:21–19(i)(6) .........................................................................23

**Other Authorities**

Newberg on Class Actions, Fourth ............................................................................39

**Rules**

Fed. R. Civ. Pro. 23 ............................................................................... passim

In this wage and hour class action, Plaintiffs Ever Bedoya, Diego Gonzales, and Manuel DeCastro (collectively "Plaintiffs") are former courier drivers who were classified as "independent contractors" and allege that they were actually "employees" of Defendant American Eagle Express, Inc. ("AEX") under the so called New Jersey ABC test.  Based on this alleged improper classification, Plaintiffs assert claims under the New Jersey Wage Payment Law ("NJWPL") N.J. Stat. §34:11-4.2 and §34:11-4.4, the New Jersey Wage and Hour Law ("NJWHL") N.J. Stat. §34:11-56a(4), and the New Jersey doctrine of unjust enrichment.  See Complaint (Doc. 1).  Plaintiffs seek to recover unlawful deductions taken out of their pay checks as well as other business expenses they have been required to incur without reimbursement.  Plaintiffs also seek unpaid overtime premium pay for the weeks when they worked over 40 hours.

Plaintiffs move for class certification pursuant to Fed. R. Civ. Pro. 23, as this case is especially suitable for resolution on a classwide basis on behalf of all courier drivers who performed work for AEX in New Jersey.  AEX has a categorical policy of treating all class members as independent contractors, as opposed to employees.  All members of the proposed class share the same job duties, execute the same standard Transportation Brokerage Agreement drafted by AEX, performed courier services pursuant to AEX's uniform specifications, were paid under the same compensation system (which did not provide for time-and-a-

1

half overtime pay regardless of how many hours the drivers worked), and were subject to withholdings and offsets by AEX to their compensation. Thus, Plaintiffs' claims present a single, underlying legal question common to every proposed class member, which is whether AEX misclassified all of these workers as independent contractors when they should have been treated as "employees" under the "ABC" test articulated by the New Jersey Supreme Court in <u>Hargrove v. Sleepy's, LLC</u>, 220 N.J. 289 (2015). As discussed below, the New Jersey ABC test is uniquely subject to common proof on each of its prongs.

> Plaintiffs' misclassification claim is

> of great importance not just to this case but to the structure of the American workplace. The number of independent contractors in this country is growing. There are several economic incentives for employers to use independent contractors and there is a potential for abuse in misclassifying employees as independent contractors. Employees misclassified as independent contractors are denied access to certain benefits and protections. Misclassification results in significant costs to government: "[B]etween 1996 and 2004, $34.7 billion of Federal tax revenues went uncollected due to the misclassification of workers and the tax loopholes that allow it." ***And misclassification "puts employers who properly classify their workers at a disadvantage in the marketplace[.]"***

<u>Craig v. FedEx Ground Package System, Inc.</u>, 686 F.3d 423, 430-31 (7th Cir. 2012) (internal citations omitted; emphasis supplied).

As discussed below, each of the requirements of Rule 23 (a) and (b) are met. Moreover, federal courts regularly certify similar classes of allegedly misclassified independent contractors asserting wage claims under state law in which the "ABC"

test is utilized to determine "employee" status.  Thus, Plaintiffs respectfully ask

this court to certify a class consisting of:

> All persons who executed a Transportation Brokerage Agreement to perform courier services for Defendant American Eagle Express, Inc. ("AEX"), either personally or on behalf of a corporate entity, and worked for AEX as a courier at any time from May 1, 2008[1] to the present in the State of New Jersey.

These individuals shall be referred to as "Couriers" or "Class Members"

## I.    FACTUAL BACKGROUND

### A.    AEX's General Operations

According to its corporate website, AEX provides "last-mile delivery,

courier solutions, fleet logistics, and critical delivery for material that is time-

sensitive or confidential" and "service over 10,000 locations a day through a

network of 9 regional distribution centers and 450 [delivery service providers]

operating across 14 states in the Mid-Atlantic."  See Exhibit 1 (www.aexgroup.net)

(last accessed Sept. 6, 2019).  This includes the delivery of products to pharmacies,

banks, and other retailers.  Deposition of Kraig Wade ("Wade Dep.") attached as

Exhibit 2, at 9:05-9:14.

---

[1] Plaintiffs filed their Complaint on May 1, 2014.  See Complaint (Doc. 1).  While the NJWPL is silent as to the statute of limitations, New Jersey courts have adopted the six-year statute of limitations for such claims borrowing the limitations period governing civil tort and contract actions under N.J.S.A. § 2A:14-1.  Bouder v. Prudential Fin., Inc., 2009 WL 4576056, at *12 (D.N.J. Dec. 2, 2009); Spellman v. Express Dynamics, LLC, 150 F. Supp. 3d 378, 391 (D.N.J. 2015).  Under New Jersey law, a six-year statute of limitations applies to unjust enrichment claims, see Rubinsky v. Zayat, 2015 WL 3517629 (D.N.J. June 4, 2015), and a two-year statute of limitations period applies the NJWHL claims, see N.J. Stat. § 34:11-56a25.1.

During the relevant class period, AEX has operated at least four regional distribution centers in New Jersey.  See AEX's Answers to Plaintiffs' First Set of Interrogatories, attached at Exhibit 3, at Interrogatory No. 3 (identifying facilities in Clifton, Linden, and Delran, New Jersey); Wade Dep. (Ex. 2) at 7:01-7:19 (discussing AEX's New Brunswick, New Jersey facility).  During the period of May 1, 2008 through July 2, 2014,[2] AEX had 754 Couriers providing delivery services within the State of New Jersey.  See AEX's Answers to Plaintiffs' First Set of Interrogatories (Ex. 3) at Interrogatory No. 1; see also Wade Dep. (Ex. 2) at 29:12-29:15 (testifying that there were approximately 73 Couriers working out of the Linden facility as of March 2016).

Plaintiffs each worked as Couriers for AEX for approximately six years ending in late 2014.  See Deposition of Manuel DeCastro ("DeCastro Dep.") attached as Exhibit 4, at 20:20-21:25; Deposition of Ever Bedoya ("Bedoya Dep.") attached as Exhibit 5, at 10:15-10:18; 25:10-25:13; 48:15-48:25; 56:05-56:11; see also Complaint (Doc. 1) at ¶¶ 3-5.  Plaintiffs were originally based at AEX's Clifton facility, but then moved to the Linden location once it opened.  Id.

## B.    AEX's Uniform Independent Contractor Classification

It is AEX's uniform corporate policy to classify all Couriers as independent

---

[2] Despite Plaintiffs' efforts to have AEX update its response to this interrogatory pursuant to Rule 26(e), see Doc. 133, AEX has refused to do so.

contractors and not employees.  As Executive Vice President Andrew Carlin

testified, AEX's one-size-fits-all classification applies regardless of any purported

"individualized" traits among Couriers:

> Q:  And is it true, in fact, that all the contractors, regardless of the customer, are classified as independent contractors, right?
> A:  Correct.
> Q:  Every single driver, regardless of the customer, is an independent contractor, is that accurate?
> A:  Every single contractor, yes, is a contractor.
> ***
> Q:  In other words, none of the drivers are W-2 employees?
> A:  Correct.
> Q:  They are all independent contractors?
> A:  Correct.
> Q:  And that's an across-the-board classification that the company has made, right?
> A:  Correct.
> ***
> Q:  And the company makes that classification regardless of the particular customer?
> A:  Yes.

Deposition of Andrew Carlin ("Carlin Dep."),[3] attached as Exhibit 6, at 76:05-

76:13, 77:12-77:20, 77:23-78:10; see also id. 94:11-95:17; Wade Dep. (Ex. 2) at

9:19-10:06.  Mr. Carlin also acknowledged that AEX does not conduct any

---

[3] The depositions of Andrew Carlin, J.D. Gamble, Michael Maenner, and Gina Kremper were taken between 2010 and 2012 as part of a Fair Labor Standards Act collective action brought on behalf of its courier drivers nationwide titled Spellman, et al. v. American Eagle Express, Inc., 2:10-cv-01764-JS (E.D. Pa.) and a class action under Pennsylvania law titled Sherman, et al. v. American Eagle Express, Inc., 2:09-cv-00575-JS (E.D. Pa.).  The testimony falls within the proposed class period and several of these transcripts have been relied upon by AEX to respond to Plaintiffs' written discovery in this case.  See AEX's Second Supplemental Responses to Plaintiffs' Requests for Production, attached as Exhibit 7, at Request No. 24.

analysis of the individual circumstances of Couriers to determine whether the uniform classification is appropriate.  <u>See</u> Carlin Dep. (Ex. 6) at 77:23-78:10; <u>see also</u> Deposition of J.D. Gamble ("Gamble Dep."), attached as Exhibit 8, at 19:05-19:19; 21:05-21:15; 23:12-24:01.

### C.    AEX's Use of the Standardized Transportation Brokerage Agreement ("TBA")

It is AEX's uniform policy to require all Couriers sign a standardized TBA. Wade Dep. (Ex. 2) 82:12-82:18; Deposition of John Skrivanic ("Skrivanic Dep.") attached as Exhibit 9, at 34:20-35:07; Carlin Dep. (Ex. 6) at 17:17-17:20; Gamble Dep. (Ex. 8) at 17:20-18:04; Deposition of Gina Kremper ("Kremper Dep."), attached as Exhibit 10, at 11:13-11:17, 148:07-148:15.  This included each of the Plaintiffs.  <u>See</u> Docs. 6-1 through 6-3 and 8-1 through 8-3.  According to AEX, the TBA "***governs the parties' relationship***."  AEX's Answers to Plaintiffs' First Set of Interrogatories (Ex. 3) at Interrogatory No. 4 (emphasis supplied).

The TBA also possesses uniform provisions that universally apply to each Courier, including, *inter alia*:

- "Duration of Agreement and Termination" with a term of "one (1) year commencing on the Effective Date set forth at the top of this page, and shall automatically renew for additional one (1) year periods unless otherwise terminated as set forth herein."  <u>See</u> Template TBAs, attached as Exhibits 11-12 at ¶ 2;

- "Service Failure and Cargo Claims" in which AEX "reserves the right to investigate all reported service failure claims submitted by the Customer, including but not limited to, delays, shortages,

misdeliveries, and claims related to lost, damaged or contaminated deliveries, arising out of, or in connection with [Courier's] services to determine if [Courier's] actions or omissions resulted in or contributed to the claim. If it is determined that [Courier's] actions or omissions resulted in or contributed to the claim, then [AEX] shall charge back [Courier] the entire amount of all service failure and cargo claims, including any expenses incurred by [AEX] with respect to such claim." Id. at ¶ 6; and

- "Service Standards" providing eight detailed obligations that apply universally to all Couriers that failure to adhere to could result in deductions from their compensation. Id. at ¶ 13.

AEX's use of the standardized TBA is an essential aspect of its uniform classification of Couriers as non-employee independent contractors in New Jersey. See id. at ¶ 14 ("INDEPENDENT CONTRACTOR STATUS").[4] The TBAs are also presented to Couriers on a "take it or leave it" basis. See Bedoya Dep. (Ex. 5) at 94:10-94:20; DeCastro Dep. (Ex. 4) at 104:13-104:16; Declaration of Kofi Adu-Bekoe ("Adu-Bekoe Decl."), attached as Exhibit 13 at ¶ 6.

### D.    Plaintiffs and Class Members Performed their Work Within AEX's Usual Course of Business and Usual Place of Business (Prong B)

It is undisputed that the delivery work of Couriers is integral to AEX's primary business of performing delivery services for its customers. Wade Dep.

---

[4] Importantly, courts have repeatedly held that unilateral labels of "independent contractor" are not determinative of statutory employee status. See, e.g., Williams v. Jani-King of Phila. Inc., 837 F.3d 314, 323 (3d Cir. 2016) (observing that "*labels* used in an agreement . . . are not determinative" of employment status); D'Annunzio v. Prudential Ins. Co. of Am., 192 N.J. 110, 122 (2007) (holding that courts "must look beyond the label attached to the relationship" to determine whether an individual is an employee or independent contractor).

7

(Ex. 2) 22:14-22:17 ("Q:  AEX is in the delivery business and if you can't drive, you can't perform their services?  A:  Courier service, yes."); Kremper Dep. (Ex. 10) at 195:02-195:22 ("Q:  And why is it that you say that the pickup and delivery services provided by the contractors are an integral part of AEX's business?  A: It's the primary reason why we need contractors, drivers."); _accord_ Skrivanic Dep. (Ex. 9) at 16:05-16:11.

Moreover, AEX requires that the Couriers start and end their work day at one of its New Jersey distribution centers.  _See_ Wade Dep. (Ex. 2) at 13:10-14:12; 30:17-30:22; Bedoya Dep. (Ex. 5) at 25:03-25:13; 26:13-32:21.  In the morning, Couriers are required to report to the distribution centers to obtain their daily manifest,[5] sort goods that have been unloaded from the trucks of AEX's customers for their assigned route and organize them for delivery, load their vehicles in the order listed in the manifest, and begin driving to make their initial deliveries. Wade Dep. (Ex. 2) at 11:17-13:03; 34:01-41:12; Skrivanic Dep. (Ex. 9) at 8:02-9:23; DeCastro Dep. (Ex. 4) at 31:01-34:09; Declaration of Robert Sikorski ("Sikorski Decl."), attached as Exhibit 14 at ¶¶ 11-13; Declaration of Ronald Oliveri ("Oliveri Decl."), attached as Exhibit 15 at ¶¶ 11-13.  At the end of the day,

---

[5] As discussed more thoroughly in section I.E.1.a, _infra_, the "manifest" provide Couriers with, _inter alia_, the address of each delivery stop, the name of the location, the time the product is to be delivered, the exact order that the stops have to be made, and the product and count to be delivered to each stop.  _See_ Wade Dep. (Ex. 2) at 41:13-43:07; Bedoya Dep. (Ex. 5) at 25:23-26:03.

Couriers are required to come back to the facility to, *inter alia*, return paperwork, certain product, and the empty "totes" that carried product. <u>See</u> Wade Dep. (Ex. 2) at 49:22-51:13; Skrivanic Dep. (Ex. 9) 19:02-21:11; Bedoya Dep. (Ex. 5) 33:24-34:13; Sikorski Decl. (Ex. 14) at ¶ 16; Oliveri Decl. (Ex. 15) at ¶ 16.

The delivery routes that Couriers service in New Jersey are also assigned, controlled and maintained by AEX. <u>See</u> Wade Dep. (Ex. 2) 22:25-25:15; 28:13-29:11; 30:17-32:20; 46:18-48:09; Bedoya Dep. (Ex. 5), at 23:14-25:02. For example, AEX unilaterally added stops to Plaintiff without his consent. <u>See</u> Bedoya Dep. (Ex. 5) at 34:19-35:20; 87:12-88:08. In essence, the routes are feudal territories that AEX commands so long as it is servicing the customer.

In sum, all Couriers performed the same type of integral work for AEX (i.e., pick-up and delivery services); out of the same types of locations (i.e., AEX distribution centers where they reported each morning and at the end of each day); on the same type of pre-planned and heavily monitored[6] delivery routes operated by AEX. These are the central facts affecting application of Prong B to each Courier regardless of supposed individualized circumstances.

### E.    AEX's Right to Control Class Members' Work (Prong A)

AEX's uniform classification of Couriers as independent contractors is

---

[6] A more thorough discussion of AEX's stop level monitoring of Couriers and other detailed protocols Couriers are required to follow is provided at section I.E., *infra*.

9

consistent with AEX's goal of making Couriers "interchangeable" by:

> set[ting] our contractors up to give them the ability to do multiple work for multiple customers, so – which gives them the ability to do more work.  So, by doing that, we have to make sure that they are all in compliance with what all our customers want, and they need to follow that protocol so that we don't – we want to be consistent across the board with every contractor so that they can provide services to any of our customers.

Carlin Dep. (Ex. 6) at 27:09-28:03; see also Wade Dep (Ex. 2) 25:19-27:03.

In furtherance of its goal to make Couriers "interchangeable," AEX has implemented numerous protocols that universally apply to Couriers regardless of purported individualized issues, such as the customer he or she may be servicing. As indicated below, examples abound:

### 1. Tracking Couriers through AEX's "Stop-Level Dispatch Control."

AEX subjects all Couriers to "Stop-Level" management, which is described as the real time monitoring of all Couriers as they make each pickup and delivery in their assigned route.  As a member of AEX's upper management testified, AEX's "Stop Level Dispatch Control" and "High-Touch Management approach" enables AEX to monitor Couriers in a more detailed way than its competition.  See Kremper Dep. (Ex. 10) at 96:15-97:13; see also id. at 90:19-91:20 ("Some of our competition don't do any monitor – stop level management or monitoring at all"). Moreover, this uniform approach by AEX applies to all Couriers regardless of the customer he or she is servicing, see id. at 91:20-92:11, and is administered by AEX

through the following:

### a.  *Courier Manifests*

Each day all Couriers for AEX are provided manifests that detail: (i) the pickup and delivery stops he or she will make as part of that day's route, (ii) the order in which the stops should take place, (iii) the "Customer Commit Time" when the stop is to be made, (iv) the addresses of stops, and (v) the number of pieces of product being picked up or delivered at each stop.  See Wade Dep. (Ex. 2) at 32:21-36:02; 41:13-43:07; Kremper Dep. (Ex. 10) at 13:02-16:04; 27:10-29:12; 38:22-39:02.  Absent AEX's authorization, all Couriers must make deliveries in the order, time and at the address listed on the manifest.  Wade Dep. (Ex. 2) at 35:17-36:02; 97:21-99:02; Bedoya Dep. (Ex. 5) 25:23-26:03; Kremper Dep. (Ex. 10) at 29:13-29:22. Couriers are required to obtain "clear signatures" on the manifest from customer representatives at each listed stop once delivery is completed.  Wade Dep. (Ex. 2) at 52:02-52:21; DeCastro Dep. (Ex. 4) at 40:05-40:11. Failure to adhere to the manifest can result in the Couriers' termination by AEX.  See Wade Dep. (Ex. 2) at 97:21-98:24; Exhibit 16 at D-2666.

### b.  *Customer Commit Time*

The "Customer Commit Time" provided in the manifest is the time that AEX's customers want their pickups and deliveries made.  Kremper Dep. (Ex. 10) at 28:15-28:17.  AEX utilizes a common rule that deliveries must be made within

11

the 15 minute period before or after the Customer Commit Time, see id. at 29:18-30:20; 37:19-38:21, which is an expectation common to all Couriers, see Carlin Dep. (Ex. 6) at 65:14-65:24; Skrivanic Dep. (Ex. 9) 39:20-40:05.

AEX requires that all Couriers report by cell phone[7] any anticipated failures to meet the Customer Commit Time.  Kremper Dep. (Ex. 10) at 32:07-33:02, 34:03-34:13, 159:10-159:15; Wade Dep. (Ex. 2) at 46:14-47:17; Skrivanic Dep. (Ex. 9) at 11:15-13:02.  Failure to make a stop within 15 minutes of the Customer Commit Time can result in non-payment or termination of a Courier.  Kremper Dep. (Ex. 10) at 42:19-43:15, 44:05-44:14, 158:13-159:09; Carlin Dep. (Ex. 6) at 14:18-16:05; Skrivanic Dep. (Ex. 9) at 26:06-29:19.

### c.   Handheld Scanning Devices to Record Progress

All Couriers are required to utilize a handheld scanning device provided by AEX.  See Kremper Dep. (Ex. 10) at 17:24-19:05, 27:17-27:21, 74:01-76:10; Wade Dep. (Ex. 2) 54:25-56:21; Skrivanic Dep. (Ex. 9) at 10:02-11:14; Bedoya Dep. (Ex. 5) at 39:22-42:14; DeCastro Dep. (Ex. 4) at 38:06-40:03.  These handheld scanners record the details of each delivery including, *inter alia*, the time of the delivery, the number of pieces of product picked up or delivered, and who at

---

[7] AEX requires that each Courier have an operational cell phone before servicing an AEX route. See Kremper Dep. (Ex. 10) at 20:21-22:05, 23:08-24:08.

the customer site signed off on the delivery and/or pickup.[8]  See Kremper Dep.

(Ex. 10) at 33:07-33:21, 75:03-75:19; Wade Dep. (Ex. 2) at 54:25-56:21.

### d. *Rockhopper and AEXTrack*

AEX uses a tracking system that enables it to closely monitor the

whereabouts of Couriers as they complete their assigned routes throughout the day.

These same monitoring protocols are used for every Courier, regardless of the

route or customer.  In particular, AEX uses a "proprietary Dispatch software"

called "Rockhopper" which works with the "AEXTrack" system to provide "Real-

Time visibility of operations" and tracking.  Kremper Dep. (Ex. 10) at 83:15-

84:14; Wade Dep. (Ex. 2) at 86:15-93:24; see also id at 58:08-61:22 (testifying that

Rockhopper is AEX's "eye in the sky" over contractors in New Jersey).  Data from

a Courier's handheld device automatically downloads into the Rockhopper

program, allowing the AEXTrack system to monitor Courier's progress

instantaneously.  Kremper Dep. (Ex. 10) at 30:21-31:04, 33:17-33:21, 75:03-76:06;

Wade Dep. (Ex. 2) 56:17-58:07.

Rockhopper and the AEXTrack system enable AEX to compare the actual

pick-up or delivery time with the Customer Commit Time to identify any gaps.

---

[8] Prior to the handheld scanning device, AEX required Couriers to call AEX dispatch from their cell phone and report these pickup and delivery details after each stop.  See Kremper Dep. (Ex. 10) at 157:17-158:12; Bedoya Dep. (Ex. 5) at 39:22-42:14; 35:21-36:22.

See Carlin Dep. (Ex. 6) at 62:11-65:06; Skrivanic Dep. (Ex. 9) at 10:02-11:14.

AEX is immediately alerted of any deviations from the manifest and has a

dispatcher promptly contact the Courier.  Wade Dep. (Ex. 2) 57:06-58:07.

### 2.    *Security and Compliance Audit Process*

AEX also has a detailed "Security and Compliance Audit Process" ("Audit

Process") that applies to all Couriers regardless of the customer they are assigned

to by AEX.  See Carlin Dep. (Ex. 6) at 29:02-29:05.  As Executive Vice President

Carlin stated:

> [O]ur customers require that our vehicles be secured and their products
> be secured upon delivery.  All our customers require that.  So, the
> [A]udit [P]rocess ensures that that is occurring, and we provide
> feedback to our customers with that information based on their
> specifications.

Id. at 28:19-29:01.

AEX's uniform Audit Process is overseen by a dedicated "Security and

Compliance Department" headed by Director Michael Maenner.  See Kremper

Dep. (Ex. 10) at 78:01-78:21.  The features of AEX's Audit Process include:

### a.    *Screening of Courier Applicants*

AEX requires that all Couriers are vetted prior to signing a TBA through a

standardized process.  See Wade Dep. (Ex. 2) 102:11-103:12; Exhibit 17 at

D00203.  Regardless of AEX customer, this process includes a motor vehicle

inspection, a criminal background check, and passing a drug test.  Deposition of

Michael Maenner ("Maenner Dep."), attached as Exhibit 18, at 19:08-22:03, 36:04-36:13; Wade Dep. (Ex. 2) at 18:05-21:17; DeCastro Dep. (Ex. 4) at 25:13-26:03; see also Wade Dep. (Ex. 2) at 103:18-106:20 (describing the vehicle inspection process);[9] Exhibit 19 at D01405 (same).

### b.  Route Orientation for Couriers

Once hired by AEX, Couriers have to participate in an orientation on their assigned route.  Wade Dep. (Ex. 2) at 23:02-25:18; Skrivanic Dep. (Ex. 9) at 13:03-14:15.  This training typically takes a week to complete.  Wade Dep. (Ex. 2) at 23:02-25:18.  Once completed, AEX management determines if that particular Courier will be able to handle the assigned route.  Id. at 28:13-29:11.

### c.  Covert Field Audits

For at least a portion of the proposed class period AEX performed random covert field audits on all Couriers regardless of the customer they were assigned.  See Kremper Dep. (Ex. 10) at 113:20-114:09; Wade (Ex. 2) at 72:12-75:25; 95:11-97:16; Bedoya Dep. (Ex. 5) at 52:23-54:01.  Many of these audits are performed by individuals with law enforcement background.  See Maenner Dep. (Ex. 18) at 91:06-92:21.  As part of the Field Audit Checklist, Couriers are graded under

---

[9] AEX also conducts follow-up vehicle inspections annually for each Courier, see id., and Couriers had to check daily to make sure the locks on their cars were functional, see Bedoya Dep. (Ex. 5) at 44:20-44:23.

uniform standards that apply to every customer of AEX.  These *universal* grading criteria include, *inter alia*:

- "Engine is turned off whenever operator is out of the vehicle.";

- "All vehicle keys are removed and retained whenever the operator is out of the vehicle.";

- "All doors / windows are fully secured when unattended by operator or in transit.";

- "Cargo left unattended and placed at risk.";

- "No unauthorized passengers are on board.";

- "Vehicle makes no unauthorized stops.";

- "Packages are properly closed and sealed.";

- "Vehicle is parked appropriately and the minimal practicable distance from service point.";

- "Vehicle in use is on record with AEX.";

- "Cargo is concealed from view from outside the vehicle.";

- "All customer documents are concealed and secured.";

- "Photo ID is worn by IC.  Must be readily visible.  Under clothing is not acceptable.";

- "Cell phone is carried on the person during the service stop.";

- "Backup vehicle / ignition key(s) are carried on the person during the service stop."; and

- "Handheld unit is properly handled and secured."

See Exhibit 20 at D00224; see also Wade (Ex. 2) at 72:12-75:25; 95:11-97:16; Bedoya Dep. (Ex. 5) at 45:12-45:20; 46:18-47:07; DeCastro Dep. (Ex. 4) at 57:01-59:05.  Couriers are given either a "Pass" or "Fail" grade on these criteria by the

AEX auditor, or marked as "see note" or "not applicable" on the corresponding Audit Report.  <u>See</u> Maenner Dep. (Ex. 18) at 97:03-97:08; <u>see also</u> Exhibit 20.

### d.    *Courier Review / Remediation*

Completed Field Audit Reports are sent by the Security and Compliance Department to the Courier's respective operations manager to determine the appropriate punishment.  Maenner Dep. (Ex. 18) at 101:05-102:13; Kremper Dep. (Ex. 10) at 127:24-130:01; Wade Dep. (Ex. 2) at 76:12-79:04.  Punishment can include, *inter alia*, fines and termination of the Courier.  <u>See</u> Carlin Dep. (Ex. 6) at 55:15-56:01; Wade Dep. (Ex. 2) at 95:11-97:16; Skrivanic Dep. (Ex. 9) at 37:19-38:19; Maenner Dep. (Ex. 18) at 106:22-107:22; DeCastro Dep. (Ex. 4) at 57:01-59:05.  The Courier's manger then sends feedback to the Security and Compliance Department through the "manager's response" tab of the computerized Field Audit Checklist.  Kremper Dep. (Ex. 10) at 130:02-131:23.

### 3.    *Additional Company-Wide Restrictions on Couriers*

In addition to the uniform protocols discussed above, AEX also enforces additional rules that apply to all Couriers regardless of customer.  These include, *inter alia*: (i) not allowing Couriers to unilaterally select substitute drivers to cover their assigned route; <u>see</u> Kremper Dep. (Ex. 10) at 187:08-189:08; (ii) not allowing Couriers to switch routes in the middle without approval from AEX; <u>id.</u> at 186:05-186:16; (iii) requiring all Couriers to wear clothing or IDs identifying them as an

AEX contractor; <u>see</u> Wade Dep. (Ex. 2) at 66:03-66:23; 69:10-70:14; Bedoya Dep. (Ex. 5) at 42:17-42:23; DeCastro Dep. (Ex. 4) at 59:06-60:21; Kremper Dep. (Ex. 10) at 168:02-169:06; (iv) requiring Couriers to be properly groomed by AEX standards. <u>see</u> Kremper Dep. (Ex. 10) at 40:19-41-04, 169:07-169:24; (v) prohibiting Couriers from carrying any products in their vehicles other than those to be delivered for AEX while servicing an AEX route. <u>See</u> DeCastro Dep. (Ex. 4) at 102:15-102:21; Sikorski Decl. (Ex. 14) at ¶ 18; Oliveri Decl. (Ex. 15) at ¶ 18; and (vi) requiring Couriers to be courteous, act in a professional manner, and safely operate their vehicles. <u>See</u> Kremper Dep. (Ex. 10) at 41:05-41:15; Wade Dep. (Ex. 2) at 66:03-66:23; 68:01-68:06; Skrivanic Dep. (Ex. 9) at 14:06-15:25.

## F.    Class Members Did Not Operate "Independently Established" Businesses (Prong C)

As discussed above, all Couriers are required to execute a TBA in order to work for AEX. <u>See</u> section I.C., *supra*. For the overwhelming majority of the class period, AEX has required each Courier to form a corporate entity or partnership and individually execute a TBA on behalf of that entity. <u>See</u> Exhibit 21 at D-2679-81; Wade Dep. (Ex. 2) 99:14-100:16; Bedoya Dep. (Ex. 5) at 43:04-44:17; 63:14-64:22; DeCastro Dep. (Ex. 4) at 65:19-66:16. However, despite this "incorporation" requirement, Couriers did not operate anything resembling their own independent businesses. This is especially evident for four reasons.

First, as discussed above, the delivery routes the Couriers service for AEX in

New Jersey are distributed, controlled and maintained by AEX.  See Wade Dep.

(Ex. 2) 22:25-25:15; 28:13-29:11; 30:17-32:20; 46:18-48:09; Bedoya Dep. (Ex. 5)

at 23:14-25:02.  Couriers do not bring the route or customer to AEX or take it with

them after they leave AEX.  Id.  AEX also makes unilateral changes to the route

without the consent of the Courier.  See, e.g., Bedoya Dep. (Ex. 5) at 34:19-35:20;

87:12-88:08 (discussing added stops on the route he was required to accept).

Moreover, Couriers' work for AEX does not continue as an independently

established business after their relationship with AEX ends.  Id. at 56:05-56:20

(testifying that he was unemployed for five or six months after leaving AEX).

Second, the restrictions that AEX places on Couriers while they are

servicing AEX's routes prevents them from simultaneously earning other income.

For example, Couriers are prohibited from carrying any product that is not related

to their AEX work while servicing a route and are not allowed to make any

"unauthorized stops."  See DeCastro Dep. (Ex. 4) at 102:15-102:21; Sikorski Decl.

(Ex. 14) at ¶ 18; Oliveri Decl. (Ex. 15) at ¶ 18; Exhibit 20 at D00224.  In addition,

Couriers are required to adhere to AEX's strict Customer Commit Time that

prevents the delivery of product outside the 30 minute window for the preset

manifest delivery time.  See section I.E.1.b., infra.  These constraints, combined

with AEX omnipresent "real time tracking" of Couriers, see section I.E.1., infra,

eliminates their ability to provide delivery services for other companies at the same

time or otherwise maintain a business that is not dependent on AEX to exist. That is why AEX is typically the Couriers' sole income source while working for the company. See DeCastro Dep. (Ex. 4) at 63:06-63:09; Sikorski Decl. (Ex. 14) at ¶ 19; Oliveri Decl. (Ex. 15) at ¶ 19; Adu-Bekoe Decl. (Ex. 13) at ¶ 19.

Third, Couriers' weekly compensation is pre-determined and standardized based on the assigned route, not the Couriers' skill or efficiency. See Carlin Dep. (Ex. 6) at 60:06-60:14; Wade Dep. (Ex. 2) 80:02-80:24.

Fourth, Couriers, regardless of routes or customers, do not require any unique skill in order to perform the pick-up and delivery services they provide to AEX – just a valid driver's license and a vehicle. See Wade Dep. (Ex. 2) at 21:18-22:13; Kremper Dep. (Ex. 10) at 191:11-192:09; see also Kremper Dep. (Ex. 10) at at 192:10-192:13 ("Q: Do they have to have any specialized skills beyond the ordinary skills that a person obtains just being alive? A: Not that I am aware of."). The ability to drive is not a unique skill enabling an individual to independently operate a business that can exist absent an alleged employer such as AEX.

## G.    AEX's Uniform Policy of Making Deductions to Couriers' Pay and Failing to Pay Couriers Overtime Premium Compensation

As discussed above, this lawsuit challenges AEX's practice of taking withholdings and offsets from the compensation of Plaintiffs and other New Jersey Couriers as well as failing to pay them overtime premium pay when they worked over 40 hours in a week. Notably, AEX does not deny the existence or application

of these company-wide practices in New Jersey.

For example, AEX readily admits that Couriers "reimburse AEX through offsets from [their] settlement compensation."  AEX's Answers to Plaintiffs' First Set of Interrogatories (Ex. 3) at Interrogatory No. 11.  AEX also identified *36 different deductions* it makes to Couriers' compensation as well as the approximate amounts of those withholdings.  See id. and attached chart (identifying withholdings ranging from, for example, "Background Check" to "Stop Payment Fee").  AEX also acknowledges that its Couriers are required to incur certain business expenses that are otherwise not required of statutory employees.  See, e.g., id. at Interrogatory No. 10 (listing "workers' compensation/occupational accident insurance" and "primary auto liability coverage"); Template TBAs (Ex. 11-12) at ¶ 5 (identifying "OPERATIONAL EXPENSES" that Couriers must incur including, *inter alia*, "roadworthy" vehicles and "mobile communication equipment"); Bedoya Dep. (Ex. 5) at 59:09-63:01; 68:19-74:22 (testifying about being charged for a broken scanner and other withholdings); DeCastro Dep. (Ex. 4) at 22:10-22:18 (testifying about being subject to withholdings by AEX).

Moreover, "AEX admits that it never paid [Plaintiffs] Gonzales and DeCastro overtime premium compensation," Answer (Doc. 8) at ¶ 19, even though Couriers work very long hours, see, e.g., Skrivanic Dep. (Ex. 9) at 19:18-21:18.

21

For example, Plaintiff Bedoya estimates that it took 8 to 9 hours a day to just drive his route, not including the additional 45 minutes to an hour he spent sorting his delivery and loading his vehicle at the beginning of the day. See Bedoya Dep. (Ex. 5) at 35:21-37:10; 29:07-32:21; see also Adu-Bekoe Decl. (Ex. 13) at ¶ 20 (testifying that he worked approximately 60 hours a week).

Importantly, AEX has acknowledged that these same uniform business practices by the company would be impermissible if Plaintiffs and other Couriers were deemed employees under New Jersey law. See Doc. 69-1 at pp. 28-29.

## II. THE DEFINITION OF AN "EMPLOYEE" UNDER NEW JERSEY WAGE LAWS IS EXPANSIVE AND SUITABLE FOR CLASSWIDE RESOLUTION.

### A. Plaintiffs' Claims are Governed by the "ABC" Test Set Forth in *Hargrove v. Sleepy's*, which Places the Burden on AEX to Show that the Couriers are not Employees

Under New Jersey law, if Plaintiffs and other Couriers are employees, then AEX's compensation practices are clearly unlawful under the NJWPL and NJWHL. See N.J. Stat. §34:11-4.2 and §34:11-4.4; N.J.S.A. §34:11-4.1 to 4.14. The merits of these claims are governed by the "ABC" test articulated by the New Jersey Supreme Court in Hargrove v. Sleepy's, LLC, 220 N.J. 289 (2015).

Under the ABC test, an individual providing a service to a purported employer is presumed to be an employee unless the alleged employer can show:

> (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his

22

contract of service and in fact; ***and***

(B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; ***and***

(C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.

N.J.S.A. §43:21–19(i)(6). The test is conjunctive, thus, "the failure to satisfy any one of the three criteria results in an 'employment' classification." Hargrove, 220 N.J. at 305; see also Hargrove v. Sleepy's, No. 10-1138, Transcript of Oral Decision, at pp. 10-11 (D.N.J. Oct. 25, 2016) (attached Exhibit 22) (holding delivery drivers in New Jersey to be employees as a matter of law).

**B.    AEX's Common Policies and Procedures Permit the Court to Make Categorical Determinations regarding Plaintiffs' Claims**

Due to the nature of employment misclassification claims, "the United States Supreme Court [] [has] expressed a strong preference for rendering decisions on the classification of employees on [a] class wide basis." De Giovanni v. Jani-King Int'l, Inc., 262 F.R.D. 71, 86 (D. Mass. 2009) (*citing* Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 327 (1992) (determination of employment status "generally turns on factual variables within an employer's knowledge, thus permitting categorical judgments about the 'employee' status of claimants with similar job descriptions")); accord Thomas v. Matrix Corp. Servs., Inc., 2012 WL 3581298, at *3 (N.D. Ill. Aug. 17, 2012) ("class action remains the most efficient way to

23

resolve [misclassification and deductions claims].").  Accordingly, courts routinely certify employee misclassification claims (such as these) under Rule 23.  For example, in Williams v. Jani-King of Philadelphia, Inc., 837 F.3d 314, 321 (3d Cir, 2016), the Third Circuit affirmed Rule 23 certification of janitorial workers' wage claims under Pennsylvania law, where the employee status would be determined based on uniform documents related to the class members' work, such as the agreement that each class member signed and other policy documents.  Id. at 325.

The nature of the New Jersey "ABC" employment test allows for a straightforward, classwide resolution of Plaintiffs' claims.  As one federal district court recently noted when granting class certification to plaintiffs asserting similar employee misclassification claims under New Jersey law, the "essential elements of the ABC employee test" applicable in New Jersey are "provable by common evidence."  See Carr v. Flowers Foods, Inc., 2019 WL 2027299 (E.D. Pa. May 7, 2019) (certifying class of delivery drivers asserting New Jersey wage claims).

When applying similar "ABC" employment tests in other jurisdictions, including Illinois, Massachusetts, and Vermont, courts have routinely held that each of these factors can be decided on common evidence when delivery drivers assert wage claims arising from employment misclassification.  See, e.g., Costello v. BeavEx, Inc., 810 F.3d 1045, 1060 (7th Cir. 2016) (finding that class of delivery drivers could be certified under Prongs A or B of identical Illinois "ABC" test);

24

Neff v. Flowers Foods, Inc., No 15-254, slip op. (D. Vt. May 16, 2019) (attached hereto as Exhibit 23); DaSilva v. Border Transfer of MA, Inc., 2019 WL 1927869 (D. Mass. May 1, 2019) (granting class certification to delivery drivers asserting wage claims governed by the Massachusetts "ABC" test); Vargas v. Spirit Delivery & Distribution Servs., Inc., 2017 WL 1115163, at *12 (D. Mass. Mar. 24, 2017) (certifying class of delivery drivers alleging they were misclassified as independent contractors under Prongs A and C of the Massachusetts ABC test); Martins v. 3PD, Inc., 2013 WL 1320454, *5-9 (D. Mass. Mar. 28, 2013) (certifying delivery drivers' independent contractor misclassification claims under all prongs of Massachusetts "ABC" test); Reynolds v. City Express, Inc., 2014 WL 1758301, at *12 (Mass. Super. Jan. 8, 2014) (certifying claims that delivery drivers were misclassified as independent contractors in violation of Massachusetts wage statute); Spates v. Roadrunner Transportation Sys., Inc., 2016 WL 7426134, at *3 (N.D. Ill. Dec. 23, 2016) (certifying class under all three prongs of Illinois ABC test); Brandon v. 3PD, Inc., 2014 WL 11348985, at *3 (N.D. Ill. Oct. 20, 2014) (certifying class of delivery drivers under Illinois ABC test); Thomas v. Matrix Corp. Servs., Inc., 2012 WL 3581298, at *3 (N.D. Ill. Aug. 17, 2012); Ladegaard v. Hard Rock Concrete Cutters, Inc., 2001 WL 1403007, at *9 (N.D. Ill. Nov. 9, 2001) (certifying class of truck drivers under the Illinois wage payment law); Acosta v. Scott Labor LLC, 2006 WL 27118, at *6 (N.D. Ill. Jan. 3, 2006)

(certifying class asserting claims under the Illinois wage payment law); O'Brien v. Encotech Constr. Servs., Inc., 203 F.R.D. 346, 353 (N.D. Ill. 2001) (same).[10]

These decisions show that each of the three prongs of the New Jersey "ABC" test can be resolved on common evidence. For example, Prong B merely looks at the company's business and where the class members' work is performed and is not concerned with individual issues related to each Courier. Prong A (the "control" inquiry) will be resolved based on company-wide protocols through which AEX controlled and directed the Couriers' work. Further, the third Prong C deals with whether the drivers can independently do business with other courier companies, or whether they are restricted from operating an independent business and are instead dependent on AEX to exist. This final question will also be resolved based on AEX's common policies and practices related to all Couriers.

## III. THE COURT SHOULD GRANT CLASS CERTIFICATION

To certify a class, Plaintiffs must meet the four requirements of Rule 23(a)

---

[10] Additional cases certifying classes of allegedly misclassified employees asserting wage claims under an "ABC" test, or other state law tests, include the following: Sagar v. Fiorenza, 2014 WL 5489938 (Mass. Super. Ct. Jan. 18, 2014) (certifying taxi drivers' wage and misclassification claims under "ABC" test); Sandoval, et al. v. M.J.F. Bowery Corp. d/b/a/ Ten's Show Club, 29 Mass. L. Rptr. 11 (Mass. Super. Ct. July 22, 2011) (same, for exotic dancers); DeGiovanni v. Jani-King Int'l, Inc., 262 F.R.D. 71 (D. Mass. 2009) (same, for janitorial workers); see also Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81, 83 (S.D.N.Y. 2001) (granting class certification to delivery drivers on state law wage claims based on misclassification); Phelps v. 3PD, Inc., 261 F.R.D. 548, 562 (D. Or. 2009) (granting class certification to drivers' misclassification and wage claims under "control" test); Soto v. Diakon Logistics (Delaware), Inc., 2013 WL 4500693, *5-6 (S.D. Cal. Aug. 21, 2013) (certifying furniture delivery drivers' misclassification claims under state wage law's control test).

and the requirements of either Rule 23(b)(1), (2), or (3). <u>See</u> Rule 23(a)-(b).  To

satisfy Rule 23(a):

> (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests of the class" (adequacy of representation, or simply adequacy).

<u>In re Cmty. Bank of N. Va.</u>, 622 F.3d 275, 291 (3d Cir. 2010) (*quoting* Rule 23).

Rule 23(b)(3), the basis for certification here, "requires that (i) common questions

of law or fact predominate (predominance), and (ii) the class action is the superior

method for adjudication (superiority)."  <u>Id.</u>  A plaintiff seeking certification must

also prove that the proposed class is ascertainable by a preponderance of the

evidence.  <u>Byrd v. Aaron's Inc.</u>, 784 F.3d 154, 163 (3d Cir. 2015), <u>as</u> <u>amended</u>

(Apr. 28, 2015).

## A.    Ascertainability

In the Third Circuit, the ascertainability inquiry is two-fold, requiring a

plaintiff to show that: (1) the class is defined with reference to objective criteria; as

opposed to "subjective criteria, such as class members state of mind," <u>City Select</u>

<u>Auto Sales v. BMW Bank of N. Am. Inc.</u>, 867 F.3d 434, 439 n.3 (3d Cir. 2017),

and (2) there is "a reliable and administratively feasible mechanism for

determining whether putative class members fall within the class definition."

Byrd, 784 F.3d at 163 (internal quotations omitted).  The ascertainability requirement "does not mean that a plaintiff must be able to identify all class members at class certification— instead, a plaintiff need only show that 'class members can be identified.'"  Id.

Plaintiffs easily satisfy the ascertainability requirements.  As for the first criteria, the class definition is based solely on objective criteria regarding whether an individual signed a TBA and performed courier services for AEX during the class period.  Courts regularly find the ascertainability requirement satisfied for similarly defined classes.  See e.g., Williams v. Sweet Home Healthcare, LLC, 325 F.R.D. 113, 124 (E.D. Pa. 2018) (certifying class of employees "who have worked for Sweet Home within the three years prior to the filing of this lawsuit and logged overtime hours without being paid at the proper rate," and noting that "[t]his case does not raise significant issues relating to ascertainability.").

Plaintiffs satisfy the second criteria as well.  AEX has already identified 754 Class Members as of July 2, 2014.  See section I.A., *supra*.  AEX clearly has the necessary records to identify Class Members, satisfying the second ascertainability requirement.  For example, in Carr v. Flowers Foods, Inc., 2019 WL 2027299 (E.D. Pa. May 7, 2019), a federal district court certified a class of New Jersey delivery drivers asserting identical wage deduction claims under Rule 23.  There, the court certified a class of all persons who "worked as distributors for

28

[defendant]" in New Jersey and "were classified as independent contractors under their distribution agreements." Id. at *8. In a straightforward analysis, the Carr court found that the class of New Jersey drivers was "ascertainable" because one could easily determine the necessary information for class membership from the defendants' records. Id. at *10.[11] As in Carr, there are no concerns about whether the class is "ascertainable" in this case based on AEX's records.

## B.    Numerosity

Numerosity exists where the proposed class is "so numerous that joinder of all members is impracticable." Rule 23(a)(1). Here, AEX had already determined that the proposed class consists of 754 members as of July 2, 2014. See section I.A., *supra*. The class is actually larger because AEX has declined to provide an updated list as supplemental production. Id. AEX managers have also confirmed that one facility alone has as many as 70 Couriers at a time. Id. Numerosity is clearly satisfied. See Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001) (observing that "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.").

---

[11] Similarly in Neff v. Flowers Foods, Inc., No 15-254, slip op., at 22-23 (D. Vt. May 16, 2019) (attached as Exhibit 23), the court also found that a class of delivery drivers was ascertainable: "Here, the proposed class consists of Flowers Foods distributors working in Vermont who have been classified as independent contractors. These criteria - Flowers Foods workers identified by position, classification, and location - are objective and sufficiently definite. Prospective class members can be identified using Defendants' business records to determine whether they delivered Defendants' products in Vermont under Distribution Agreements."

## C.    Commonality

Commonality exists where there are "questions of law or fact common to the class." Rule 23(a)(2). The commonality "bar is not a high one," Rodriguez v. National City Bank, 726 F.3d 372, 382 (3d Cir. 2013), and "is easily met," Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994). Commonality "does not require perfect identity of questions of law or fact among all class members." Reyes v. Netdeposit, LLC, 802 F.3d 469, 486 (3d Cir. 2015). Since "'even a single common question will do,'" id. (quoting Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011)), commonality is satisfied if "'plaintiffs share at least one question of fact or law with the grievances of the prospective class,'" id. (quoting Rodriguez, 726 F.3d at 382).

As in other cases asserting wage claims based on an independent contractor classification: "liability is determined by whether the drivers are properly treated as employees or independent contractors. That satisfies commonality even under the recent Wal-Mart decision." Scovil v. FedEx. Package Sys., Inc., 886 F. Supp. 2d 45, 48 (D. Me. 2012); see also Carr, 2019 WL 2027299, at *9 (finding that "commonality is satisfied" where "the named plaintiffs … and all class members work in the same capacity, as distributors; have signed Distributor Agreements; perform the same functions;" are subject to many of the same policies; and "they advance the same legal claims"). Thus, the commonality prong is satisfied here.

30

### D.   Typicality

Rule 23(a)(3)'s typicality requirement "is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members to assure that the absentees' interests will be fairly represented." Baby Neal, 43 F.3d at 57.  Cases "challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." Id. at 58.

Here, the Plaintiffs' claims and those of other Couriers are not only typical, they are identical.  Couriers were each classified as independent contractors by AEX, signed a TBAs, worked pursuant to the same controls by AEX, subjected to the same types of withholdings to their compensation, and were not paid overtime premium compensation for hours worked over 40 in a week. See e.g., Carr, 2019 WL 2027299, at *10 (finding typicality requirement satisfied where the "named plaintiffs advance the same legal theory as the other members of their class, and have similar factual circumstances to the other members, in that they each have worked for [defendant] as distributors.... Finally, their interests are sufficiently aligned with that of the class, because they and the class seek the wage and hour protections of their respective state laws").  Thus the typicality requirement is met.

31

## E.    Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Rule 23(a)(4).  The guidelines for meeting the adequacy of representation requirement are: "(1) the class representative must not have interests antagonistic to those of the class, and (2) class counsel must be qualified, experienced, and generally able to conduct the proposed litigation."  Szczubelek v. Cendant Mortgage Corp., 215 F.R.D. 107, 119 (D.N.J. 2003).  Both factors are met here.

There is no potential conflict between the Plaintiffs and other Couriers.  All were classified as independent contractors and all are asserting the same claims based on that alleged misclassification.  Similarly, Plaintiffs' interests do not differ from those of Class Members because they seek damages for all Couriers.

With respect to the adequacy of legal counsel, Plaintiffs' attorneys are highly experienced, and highly knowledgeable class action lawyers, having litigated dozens of class action cases on behalf of workers in the service and delivery industries relating to misclassification and the improper deductions from wages.  For example, Attorney Harold Lichten litigated the Hargrove case, which resulted in the seminal decision of the New Jersey Supreme Court interpreting the New Jersey wage laws.  See Hargrove v. Sleepy's, LLC, 220 N.J. 289 (2015); see also Badia v. HomeDeliveryLink, Inc., 2015 WL 5666077, at *8 (D.N.J. Sept. 25,

2015) (approving class settlement for New Jersey delivery drivers in which attorneys at Lichten & Liss-Riordan, P.C. were appointed as class counsel). Attorneys at Winebrake & Santillo, LLC are experienced wage-and-hour attorneys and have been appointed class counsel in a number of similar cases. See, Declaration of R. Andrew Santillo ("Santillo Decl."), attached as Exhibit 24.

This experience, combined with Plaintiffs' counsel work in this case to date which includes, *inter alia*, successfully litigating this matter before the Third Circuit, see Bedoya v. American Eagle Express, Inc., 914 F.3d 812 (3d. Cir. 2019), also supports their appointment as class counsel pursuant to Rule 23(g).

## F.    Predominance

Predominance requires that common issues predominate over issues affecting only individual class members. In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 528 (3d Cir. 2004). The inquiry therefore "focuses on whether the efficiencies gained in resolving these common issues together are outweighed by the individual issues presented for adjudication." Cannon v. Cherry Hill Toyota, Inc., 184 F.R.D. 540, 545 (D.N.J. 1999) (citation omitted).

"That common issues must be shown to 'predominate' does not mean that individual issue[s] need be non-existent. All class members need not be identically situated upon all issues, so long as their claims are not in conflict with each other." Id. In other words, "granular uniformity between class members is not required for

establishing predominance." Rivet v. Office Depot, Inc., 207 F. Supp. 3d 417, 431-432 (D.N.J. 2016). Instead, Plaintiffs' claims must be "capable of proof at trial through evidence that is common to the class rather than individual to its members." Id. (quoting In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 268 (3d Cir. 2009)). As the Supreme Court recently held, a common question is one where "the same evidence will suffice for each member to make a *prima facie* showing [or] the issue is susceptible to generalized, class-wide proof." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" Id.

In a wage-and-hour case based on alleged independent contractor misclassification, the Third Circuit recently held that common questions regarding workers' classification as independent contractors predominated where the defendant's agreement with each class member and other policies "are common to the class." Jani-King, 837 F.3d at 321-22. Predominance persisted despite variations among the experiences of each class member, such as the fact that some class members had no employees who assisted them with their work, while some had dozens of their own employees, because the central questions related to

34

defendant's control over the class were not affected by these distinctions among its members.  See id.

Here, the propriety of AEX's classification of Couriers under the ABC test will be the central issue in this case and predominate over any potential differences among Class Members.  The merits of Plaintiffs and Class Member claims will be decided based on the Court's application of common legal principles to a shared set of facts that are applied universally to all Couriers.  See section I, *supra*.  As the court in Carr observed when certifying a class of delivery drivers who pursued claims under the New Jersey ABC test, "[t]he essential elements of the ABC employee test are provable by common evidence."  2019 WL 2027299, at *20.

The first ABC test factor asks whether AEX maintained the right to control Couriers' work.  As discussed in section I.E., *supra*, this factor will be adjudicated with common evidence from not only the uniform TPAs Couriers are required to sign, but also the standard control that AEX had over Couriers.  See Carr, 2019 WL 2027299, at *20 ("As to Part A—the putative employer's ability to exercise control—… common evidence would predominate in making this determination"); see also In re Fedex Ground Package System, Inc., 2007 WL 3027405, at *17-18 (N.D. Ind. Oct. 15, 2007) ("The operating agreement appears to provide common proof of FedEx's authority to control its package and delivery drivers, which allows the court to make categorical determinations of the driver's employment

status, so the varying experiences of some drivers doesn't preclude certification.").

The second prong, which asks whether Couriers performed work outside AEX's usual course of business or outside its usual place of business, is perfectly suited to class treatment. See Carr, 2019 WL 2027299, at *20 ("Part B is provable by common evidence" because the question of whether class members' functions are outside defendant's usual course of the business or performed outside of all the places of defendant's business "will require evidence of [defendant's] business model and general operations"); see also Costello, 810 F.3d at 1059 (holding that "[t]here is no doubt that common evidence will satisfy" Part B of a similar ABC test, because Part B "only requires common evidence about [the defendant's] business model"). Here, all Couriers performed the same delivery services for AEX which are the core of its business. See section I.D., *supra*. Absent Couriers, AEX could not exist. Id. Thus, the determination of this prong does not require any individualized analysis. See Martins v. 3PD, Inc., 2013 WL 1320454, at *6 (D. Mass. Mar. 28, 2013) (holding that, under similar "usual course of business" prong of Massachusetts statute, "[n]ot only does this present common issues of law and fact, but *only* evidence common to the class is relevant to this consideration).

Common evidence will also resolve the third prong of the "ABC" test, which asks whether Couriers were customarily engaged in an independently established business. To satisfy the third Prong, AEX must be able to show that Couriers

were, at the time of their relationship with AEX, engaged in an "enterprise that exists and can continue to exist independently of and apart from the particular service relationship" with the defendant. <u>Hargrove</u>, 220 N.J. at 306. If at the end of the relationship an individual joins "the ranks of the unemployed," this element of the test is not satisfied. <u>Id.</u> at 306. As discussed in section I.F., *supra*, Plaintiffs will rely on common evidence demonstrating that AEX not only distributed and strictly controlled the delivery routes Couriers worked, but also unilaterally decided the compensation that would be paid for working those routes. This feudal control of the routes prevented Couriers' delivery services from surviving independently after leaving AEX. <u>See</u> <u>e.g.</u>, Bedoya Dep. (Ex. 5) at 56:05-56:20 (testifying to being unemployed for five to six months after leaving AEX). Moreover, due to the restrictions AEX placed on its routes and the full-time nature of the work, Couriers' income was dependent on AEX.[12]

---

[12] As discussed above, the Court can resolve all three prongs on common evidence. <u>See</u>, <u>e.g.</u>, <u>Roadrunner</u>, 2016 WL 7426134, at *3 ("Each part of the [ABC] test entails evidence that will apply equally to all class members."); <u>Spirit Delivery</u>, 2017 WL 1115163, at *12 (certifying class of delivery drivers alleging they were misclassified as independent contractors under Massachusetts Prongs A and C); <u>Martins</u>, 2014 WL 1271761, at *12 (certifying class under Massachusetts Prong B). However, because the burden lies with the employer to satisfy each of the three prongs, "if just one of the criteria is provable by common evidence, this question is amenable to class treatment." <u>Roadrunner</u>, 2016 WL 7426134, at *3 (*citing* <u>BeavEx</u>, 810 F.3d at 1060); <u>see</u> <u>also</u> <u>Carr</u>, 2019 WL 2027299, at *20 ("because two of the three factors of the ABC test are readily provable through common evidence—and Plaintiffs need only establish one to prevail on their claim—their employee status is susceptible to class-wide determination").

### G.    Superiority

In addition to predominance, the Court must also find "that a class action is superior to other available methods for fairly and effectively adjudicating the controversy." Rule 23(b)(3). The superiority requirement asks the Court "to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." In re: Prudential Insurance Co. America Sales Practice Litig., 148 F.3d 283, 316 (3d Cir. 1998)

In general, courts have held that class treatment is superior where class members "shared similar roles and responsibilities, they all were governed by a uniform corporate [] policy, and they all are alleging that the [policy] was illegal." Rivet, 207 F. Supp. 3d at 432 (internal quotes omitted). That is precisely what is alleged here. "Given the number of class members, the common interest in correctly determining the employee status of the class, and the prevalence of common questions of law and fact, a class action provides a significantly more efficient litigation vehicle than individual trials." Carr, 2019 WL 2027299, at *21 (finding superiority satisfied for class of delivery drivers asserting claims under New Jersey wage laws). Other courts have held that class adjudication is superior in the employment cases because the fear of retaliation may have a chilling effect on individuals who reasonably believe that they will be retaliated against for asserting their rights. See, e.g., Spirit Delivery, 2017 WL 1115163, at *13 (finding

38

class adjudication superior to address the fear of retaliation); Overka v. American Airlines, Inc., 265 F.R.D. 14, 24 (D. Mass. 2010) ("class adjudication is superior in the employment context because fear of employer retaliation may have a chilling effect on employees bringing claims on an individual basis").

Rule 23(b)(3) also "sets out several factors relevant to the superiority inquiry," Prudential, 148 F.3d at 315-16, each of which favors certification here:

First, Rule 23(b)(3)(A) requires the Court to consider "the class members interests in individually controlling the prosecution . . . of separate actions" and generally disfavors certification where class members maintain "a high degree of emotional involvement, extremely large [individual] damages claims, and a desire to tailor trial tactics to individual needs." Newberg on Class Actions, Fourth, at § 4:29. This wage lawsuit is not such a case. Indeed, the "economies of scale" created by addressing the legality of AEX's uniform classification of Couriers as independent contractors in a single suit demonstrates that this factor is satisfied.

Second, Rule 23(b)(3)(B) requires courts to consider "the extent and nature of any litigation concerning the controversy already begun by . . . class members." Outside of the previously settled lawsuits listed in footnote 1, *supra*, Plaintiffs' counsel is not aware of other such litigation.

Third, Rule 23(b)(3)(C) requires the court to consider the desirability of "concentrating the litigation of the claims in a particular forum." Rule 23(b)(3)(C).

39

Here, concentration of all claims in the Newark, NJ courthouse is efficient and desirable because this case concerns Class Members who worked in New Jersey.

Fourth, Rule 23(b)(3)(D) requires the court to consider any "likely difficulties in managing the class action." Rule 23(b)(3)(D). Here, no such difficulties exist, since the Class Members are easily ascertainable based on AEX's internal corporate records. See section I.A., *supra.*

In sum, the proposed class satisfies all the Rule 23 requirements, making certification proper.

## IV.    CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request that the Court grant their Motion and enter the accompanying proposed order.

Dated:  September 13, 2019              Respectfully submitted,

<u>s/ R. Andrew Santillo</u>
R. Andrew Santillo
Mark J. Gottesfeld
WINEBRAKE & SANTILLO, LLC
Twining Office Center, Suite 211
715 Twining Road
Dresher, PA 19025

Harold Lichten (admitted *pro hac vice*)
Matthew Thomson (admitted *pro hac vice*)
LICHTEN & LISS RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114

*Counsel for Plaintiffs*

40