Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| EVER BEDOYA, DIEGO GONZALES, and MANUEL DECASTRO, *on behalf of themselves and all those similarly situated,*  Plaintiffs,  v.  AMERICAN EAGLE EXPRESS, INC., *d/b/a* AEX GROUP,  Defendant. | Civil Action No. 14-2811 (ES) (JSA)  OPINION |

SALAS, DISTRICT JUDGE

Presently before the Court is a motion for class certification filed by Plaintiffs Ever Bedoya, Diego Gonzales, and Manuel DeCastro—three former courier drivers of Defendant American Eagle Express, Inc., *d/b/a* AEX Group ("AEX").  (D.E. No. 136).  They claim that AEX misclassified them as independent contractors under a Transportation Brokerage Agreement ("TBA") that they and all other similarly situated couriers signed.  Due in part to that misclassification, they claim that AEX violated the New Jersey Wage Payment Law ("WPL") by withholding wages due to them as employees, and the New Jersey Wage and Hour Law ("WHL") by withholding overtime pay due to them as employees.  (D.E. No. 1 ("Compl.")).  Plaintiffs seek to certify a class consisting of all persons who executed a TBA to perform courier services for AEX, either personally or on behalf of a corporate entity, and worked for AEX as a courier at any time from May 1, 2008, to the present in the State of New Jersey.  For the reasons below, Plaintiffs' motion is **GRANTED in part** and **DENIED in part**.

## I.      BACKGROUND

### A.      Facts

AEX provides "last-mile delivery, courier solutions, fleet logistics, and critical delivery for material that is time-sensitive or confidential" to a variety of large companies such as hospitals, drug companies, and pharmacies.  (D.E. No. 136-2, Ex. 1, AEX's Website).  Between May 1, 2008, and July 2, 2014, AEX had 754 couriers providing delivery services in New Jersey, working out of four regional distribution centers in Clifton, Delran, Linden, and New Brunswick.  (D.E. No. 136-4, Ex. 3 ("AEX's ROGs") No. 1).  All couriers who drove for AEX signed a TBA.  (D.E. No. 136-12, Ex. 11 ("TBA")).[1]  Originally, couriers could sign the TBAs as individuals, but on August 25, 2014, AEX issued a notice to couriers that it would only contract with separate business entities.  (D.E. No. 136-22, Ex. 21, Business Entity Notice to Contractors).  AEX gave couriers until October 10, 2014, to submit "the attached Name-Change Addendum" to change the operative TBA "to reflect [the] business entity name."  (*Id.*).  Both AEX and the courier could terminate the relationship for any reason by giving the other party ten-days' notice in writing.  (TBA ¶ 2).  The TBA expressly classified the courier as an independent contractor, as opposed to an employee. (*Id.* ¶ 14).  However, Plaintiffs contend that because AEX exercised significant control over them, they were employees under New Jersey law.  That conclusion, they claim, is based on the TBAs they signed and AEX's generally applicable corporate policies.

### (i)      TBAs

The TBA set out several obligations of couriers.  The TBA required couriers, prior to working,    to    obtain    their    own    primary    auto    liability    insurance    and    worker's

---

[1]      Cited above, and throughout, is an unexecuted TBA dated May 1, 2008.  Although the record contains several other versions of the TBA—a similarly unexecuted TBA (D.E. No. 136-13, Ex. 12), and TBAs that Plaintiffs executed in 2008 and 2010 (D.E. No. 139-1, Exs. B–C)—the parties do not suggest the other TBAs vary in any material way.

compensation/occupational accident insurance.  (*Id.* ¶¶ 2, 8 & App'x C).  Insurance carriers were to be "A.M. Best 'A'-rated."  (*Id.* App'x C).  Couriers could not work until AEX approved their insurance coverage.  (*Id.*).  In carrying out deliveries, couriers used their own cars and cellphones that were compatible with AEX's communications system, and the TBA allocated all car- and cellphone-related expenses to the couriers.  (*Id.* ¶¶ 1, 5(a), 5(d)).  The TBA obligated couriers to make their services and cars available to enable AEX to fulfill its delivery obligations to its customers.  (*Id.* ¶ 13(a)).  In making deliveries, couriers were bound by the delivery schedule and security requirements set by AEX's customers.  (*Id.* ¶¶ 1, 13(b), 13(h)).  The TBA did not specify the vast majority of security requirements, but it did specify that a customer could request that a courier wear an AEX uniform and outwardly visible identification and that couriers could not have unauthorized passengers in their vehicles while making deliveries.  (*Id.* ¶¶ 11, 20).  AEX retained the right to investigate all service-failure claims and could charge couriers for expenses due to service failures.  (*Id.* ¶ 6).  If a courier hired another driver, the courier was to ensure the worker was a competent driver who would comply with AEX's policies and its customers' requirements. (*Id.* ¶¶ 4(a), 4(d)).   AEX retained the "right to disqualify" any driver hired by a courier "in the event . . . the driver [was] found to be unsafe, unqualified pursuant to federal or state law, in violation of [AEX's] minimum qualification standards[, or] in violation of any of the policies of [AEX's] customers."  (*Id.* ¶ 4(a)).

While couriers possessed several liberties under the TBA, each was conditioned.  Couriers could reject routes so long as they gave AEX sufficient notice to find a replacement.  (*Id.* ¶ 13(c)).  In the event the courier did not provide sufficient notice, he or she could be held liable to AEX for damages.  (*Id.*).  Couriers could modify routes, but if a customer requested a particular route, the courier was obligated to drive it.  (*Id.* ¶ 13(d)).  As noted above, couriers could, but subject to

AEX's approval, obtain their own insurance and hire employees.  Finally, couriers could devote time to other endeavors but only to the extent such endeavors did not "conflict with accepted obligations" to the customer.  (*Id.* ¶ 13(e)).  Ostensibly, a courier could not engage in other endeavors if doing so would have prevented AEX from meeting its obligations to its customers. (*Id.* ¶ 13(a)).

### (ii)     AEX Corporate Policies

Several of AEX's generally applicable corporate policies are relevant to whether couriers were employees under New Jersey law.  Those policies are evidenced primarily by statements of AEX leadership, through the testimony of John Gamble, president and CEO (D.E. No. 136-9, Ex. 8 ("Gamble Dep."); D.E. No. 139-1, Ex. A ("Gamble Decl.")); Andrew Carlin, executive vice president (D.E. No. 136-7, Ex. 6 ("Carlin Dep.")); Kraig Wade, distribution manager (D.E. No. 136-3, Ex. 2 ("Wade Dep.")); Gina Kremper, operations manager (D.E. No. 136-11, Ex. 10 ("Kremper Dep.")); John Skrivanic, operations manager (D.E. No. 136-10, Ex. 9 ("Skrivanic Dep.")); and Michael Maenner, director of security and compliance (D.E. No. 136-19, Ex. 18 ("Maenner Dep."); D.E. No. 139-4, Ex. L ("Maenner Decl.")).  AEX's corporate policies are also evidenced by several corporate documents, which will be cited below.

AEX never considered any courier an employee.  (Gamble Dep. at 18–19, 77).  In labeling a courier an independent contractor, AEX did not consider individual circumstances but rather relied only on the TBA's label.  (*Id.* at 19).

Prior to hiring, AEX screened couriers' criminal and motor vehicle histories, inspected their vehicles, and required them to undergo drug testing.  (Maenner Dep. at 19–22, 36; Gamble Dep. at 64–67; D.E. No. 136-18, Ex. 17 ("Vetting Checklist"); D.E. No. 136-20, Ex. 19 ("Vehicle Inspection Form")).  After being hired, couriers obtained routes but only after undergoing route

orientation, a week-long process where a more experienced courier rode with a less experienced courier to help the less experienced courier grow accustomed to the route.  (Wade Dep. at 22–25).  Several couriers engaged other workers to help them with their delivery obligations, indicating that AEX honored the couriers' ability to hire additional workers.  (Maenner Decl. ¶ 5).

The typical day for a courier began and ended at one of AEX's four distribution centers.  In the beginning of the workday, couriers received a daily manifest and sorted delivery items, and at the end of the workday, they returned paperwork, items, and empty totes.  (Wade Dep. at 11–14, 34; Skrivanic Dep. at 9, 19–21).

In the event customers did not, AEX devised the couriers' daily manifests.  (Carlin Dep. at 61).  The daily manifests specified the order, customer commit time, location, and items for deliveries.  (Wade Dep. at 41–43).  AEX required couriers to follow the order set forth in the manifest, absent change by AEX, and to make deliveries within 15 minutes of the customer commit time.  (Kremper Dep. at 29–30; Skrivanic Dep. at 39–40; Carlin Dep. at 66).  AEX admonished couriers, "**YOU ARE AUTHORIZED TO DELIVER ONLY TO <u>SPECIFIC</u> ADDRESSES SHOWN ON CUSTOMER MANIFESTS**."  (D.E. No. 136-17, Ex. 16, Customer and Regulatory Requirement ("Cust. & Reg. Req.")).  Otherwise, a courier could be terminated for "**cause**."  (*Id.*).  AEX ensured compliance with the daily manifests by remotely tracking couriers using data extracted from the couriers' handheld scanning devices that they used to record deliveries.  (Wade Dep. at 56–61, 86–90; Kremper Dep. at 30–31, 33, 83–84; Skrivanic Dep. at 10–11).

AEX compiled its customers' security requirements and categorically imposed them on all couriers, even couriers who did not service a particular customer.  AEX did so even though customers apparently had different security requirements.  (D.E. No. 139-4, Ex. U, Customers' Security Requirements ("Cust. Sec. Reqs.")).  AEX did so "to give [couriers] the ability to do

multiple work for multiple customers." (Carlin Dep. at 27). AEX ensured compliance with customer security requirements through field audits. (Gamble Decl. ¶ 9). Auditors checked for dozens of security requirements such as:

- "Engine is turned off whenever operator is out of the vehicle";
- "All vehicle keys are removed and retained whenever the operator is out of the [vehicle]";
- "All doors/windows are fully secured when unattended by operator or in transit";
- "Cargo left unattended and placed at risk";
- "No unauthorized passengers are on board";
- "Vehicle makes no unauthorized stops";
- "'Meet' is conducted at the prescribed location";
- "Other care, custody, and control of cargo is maintained";
- "Vehicle is parked appropriately and the minimal practicable distance from [service point]";
- "Vehicle in use is on record with AEX";
- "Cargo is concealed from view from outside the vehicle";
- "All bank bags are secured by a locking cable to the vehicle";
- "All customer documents are concealed and secured";
- "Customer keys and pass cards are concealed and secured";
- "Photo ID is worn by [courier]. Must be readily visible. Under clothing is not acceptable";
- "Cell phone is carried on the person during the service stop";
- "'No Cash' sign is fully displayed in plain view";
- "Backup vehicle/ignition key(s) are carried on the person during the service stop"; and
- "Clothing, worn properly, identifies [courier] as the courier to the customer";
- "Handheld unit is properly handled and secured"; and
- "No pets/animals on board."

(D.E. No. 136-21, Ex. 20 ("Field Audit Checklist") at D00224). After couriers were audited, AEX determined whether adverse action was necessary to remediate noncompliance. For example,

AEX could remove a courier from an assigned route, fine the courier, or terminate the courier. (Wade Dep. at 96–97; Kremper Dep. at 125; Gamble Decl. ¶ 9).

### (iii)    Pay

If couriers are employees, their pay and the manner in which they are paid are significant to Plaintiffs' claims.  The TBA provides:

> **FEES FOR SERVICES RENDERED.** It is expressly understood and agreed that CONTRACTOR's fees for transportation services rendered shall be set forth in Appendix B and such fees shall constitute the total fees for everything furnished, provided, or done by CONTRACTOR in connection with this Agreement, including driver's services.

(TBA ¶ 3).  AEX did not guarantee the courier any "minimum number of shipments," or that the courier would even "profit."  (*Id.*).  Couriers were paid a "negotiated amount based upon the routes offered by [AEX] and accepted by [the courier]."  (*Id.* App'x B).

AEX deducted various expenses from courier pay that the TBA assigned as the couriers' responsibility.  (*Id.*).  The TBA made clear AEX's contractual authority to do so:

> **CHARGE BACK.**  Broker shall charge back to CONTRACTOR at the time of payment or settlement, any expenses BROKER has borne that, under this Agreement, CONTRACTOR is obligated to bear; and as more particularly described in Appendix B.

(*Id.* ¶ 17).  AEX identified thirty-six different deductions that it could make and generally did make.  (AEX's ROGs No. 11).  Some deductions included expenses for drug screens, fuel, property damage, excess cellular use, and insurance.  (*Id.*).

Additionally, AEX did not compensate couriers for overtime even though some couriers worked over 40 hours per week.  Although Plaintiffs did not report their hours to AEX, Bedoya testified in a deposition that he frequently worked over 40 hours per week.  (D.E. No. 136-6, Ex. 5 ("Bedoya Dep.") at 29–32, 35–37).  Gonzales estimated that he worked approximately 45 hours

per week.  (D.E. No. 139-4, Ex. M ("Gonzales's ROGs") No. 7).  And Kofi Abu-Bekoe, a former courier for AEX and member of the putative class, attested that he worked approximately 12 hours per day, five days per week.  (D.E. No. 136-14, Ex. 13 ("Adu-Bekoe Decl.") ¶ 20).  However, the record ends there with respect to unpaid overtime.  DeCastro testified that he spent about one hour organizing and loading his truck in the morning and about five to six hours on the road, five days per week.  (D.E. No. 136-5, Ex. 4 ("DeCastro Dep.") at 34, 45 107).  And Robert Sikorski and Ronald Oliveri, two class members, did not indicate their hours.  (D.E. No. 136-15, Ex. 14 ("Sikorski Decl."); D.E. No. 136-16, Ex. 15 ("Oliveri Decl.")).  However, both indicated that couriers worked full days, leaving them unable to perform other work.  (Sikorski Decl. ¶¶ 7, 11, 16, 18, 19; Oliveri Decl. ¶¶ 7, 11, 16, 18, 19).

**B.     Procedural History**

On May 1, 2014, Plaintiffs filed this putative class action against AEX, raising three causes of action.  First, they claim that AEX violated the WPL, N.J.S.A. § 34:11-4.4, by taking certain deductions or withholdings from their wages that are generally not permitted to be taken from employees. (Compl. ¶¶ 26–31).  Second, they claim that AEX violated the WHL, N.J.S.A. § 34:11-56a4, by withholding overtime pay due to them as employees for hours worked over 40 in a week. (*Id.* at 32–37).   Third, they claim that AEX was unjustly enriched through the deductions, withholdings, and unpaid overtime.  (*Id.* ¶¶ 38–41).  As discussed below, a necessary, though not sufficient, condition for success on all three claims is that the couriers were employees under New Jersey law.

Plaintiffs move for class certification under Federal Rule of Civil Procedure 23.  (D.E. No. 136).  The Court held the motion in abeyance pending settlement discussions.  The parties have recently indicated that they could not settle.

## II.    LEGAL STANDARD

Under Rule 23, a party seeking class certification must satisfy both the conjunctive requirements of 23(a) and one of the requirements of 23(b).  *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 596 (3d Cir. 2009).   Rule 23(a) requires the party seeking class certification to show:

> (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical . . . of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23(a)(1)–(4)).  Where, as here, a party seeks to certify a class under 23(b)(3), the party must additionally show (5) predominance—"that the questions of law or fact common to class members predominate over any questions affecting only individual members"—and (6) superiority—"that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *See* Fed. R. Civ. P. 23(b)(3).  Finally, in this context, the party seeking class certification must show ascertainability—that the class is "defined with reference to objective criteria," and there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015) (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)).[2]

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification

---

[2]       While the Third Circuit has declined to extend the ascertainability requirement to a (b)(2) class, *see Shelton v. Bledsoe*, 775 F.3d 554, 559–63 (3d Cir. 2015), it appears an open question in this circuit whether that requirement applies to a (b)(1) class, *compare Gonzalez v. Corning*, 317 F.R.D. 443, 503 (W.D. Pa. 2016) (applying it to a (b)(1) class), *with Guidry v. Wilmington Tr.*, 333 F.R.D. 324, 328 (D. Del. 2019) (assuming it applies).

must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  A court must engage in a "rigorous analysis" to determine whether all of Rule 23's prerequisites have been satisfied.  *Id.*  (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  That rigorous analysis has "three key aspects":

> First, the court must find that the requirements of Rule 23 are met and any factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence.  Second, the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits.  Third, the court must consider all relevant evidence and arguments, including expert testimony, whether offered by a party seeking class certification or by a party opposing it.

*In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020) (cleaned up). Importantly, "[a]lthough the court must undertake a rigorous analysis at the certification stage and consider some merits-related issues, the class certification stage is not the place for a decision on the merits."  *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314, 322 (3d Cir. 2016).  "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

## III.    DISCUSSION

### A.    Numerosity

Numerosity is presumed "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40."  *Marcus v. BMW of N. Am., L.L.C.*, 687 F.3d 583, 595 (3d Cir. 2012) (quoting *Stewart v. Abraham*, 275 F.3d 220, 226 (3d Cir. 2001)).  Here, the proposed class consists

of at least 754 members, and there might be many more class members because that number does not account for new class members since July 2, 2014.  Accordingly, numerosity is satisfied.

### B.      Commonality

Commonality is satisfied if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Where, as here, a party is seeking class certification under 23(b)(3), "the commonality requirement 'is subsumed by the predominance requirement.'"  *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008) (quoting *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 627 (3d Cir. 1996)).  The Court will thus address commonality with predominance.

### C.      Typicality

The typicality requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  In addressing whether named plaintiffs satisfy this requirement, a court must address

> three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*Schering Plough*, 589 F.3d at 599.  The typicality "criterion acts as a bar to class certification only when 'the legal theories of the named representatives potentially conflict with those of the absentees.'"  *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (quoting *Georgine*, 83 F.3d at 631).

Here, the latter two requirements pose no concern for the putative class.  AEX has not pointed to any defenses it could assert against Plaintiffs that it could not assert and would be inapplicable to the putative class, nor does AEX question whether Plaintiffs' interests are

sufficiently aligned with those of the putative class.

Instead, AEX takes issue with the first requirement of typicality, arguing that there are too many factual differences between Plaintiffs and the putative class members. (D.E. No. 139 ("Opp. Br.") at 38). On this issue, AEX objects that Plaintiffs have not provided sufficient proof to show that they or all putative class members were misclassified as independent contracts, received improper withholdings, or worked over 40 hours in a given week. (*Id.*).

However, AEX's arguments "are more properly considered and relevant under the predominance and superiority analysis." *Newton*, 259 F.3d at 184. "While [some] factual differences do exist"—such as whether all couriers worked over 40 hours per week, received the same deductions and withholdings, and believed those deductions to be from wages or gross receipts—"factual differences between the proposed representative and other members of the class do not render the representative atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members." *Carrow v. FedEx Ground Package Sys., Inc.*, No. 16-3026, 2019 WL 7184548, at *8 (D.N.J. Dec. 26, 2019) (quoting *Schering Plough*, 589 F.3d at 598). "[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994). As Plaintiffs point out, their theory of relief is that each courier was misclassified by AEX as an independent contractor, signed an identical TBA, worked pursuant to the same controls, were subject to the same types of withholdings to their compensation, and were not paid overtime compensation under the same policy. (D.E. No. 136-1 ("Mov. Br.") at 31). Plaintiffs have thus satisfied typicality.

### D.   Adequacy

Adequacy is satisfied if "the representative parties will fairly and adequately protect the

interests of the class." Fed. R. Civ P. 23(a)(4). For this inquiry, a court must consider whether "the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously," and whether there is a "conflict between the individual's claims and those asserted on behalf of the class." *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) (quoting *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988)). "This inquiry is vital, as 'class members with divergent or conflicting interests [from the named plaintiffs and class counsel] cannot be adequately represented.'" *Id.* (quoting *In re Diet Drugs Prods. Liab. Litig.*, 385 F.3d 386, 395 (3d Cir. 2004)).

AEX's objection to adequacy is the same as its objection to typicality—that there are too many factual differences between the Plaintiffs and the putative class. (Opp. Br. at 38). But as noted, Plaintiffs are "pursuing claims on the same legal theory as the other members of the class, and all seek damages directly from [the d]efendant." *Carrow*, 2019 WL 7184548, at *9; *see also Portillo v. Nat'l Freight, Inc.*, 336 F.R.D. 85, 93 (D.N.J. 2020) (similar). The Court perceives no issues with respect to the adequacy of Plaintiffs as class representatives. Plaintiffs have both the ability and incentive to represent this class, and the record does not disclose any conflicts between the Plaintiffs and putative class members.[3]

### E.   Predominance

Class certification under Rule 23(b)(3) requires the named plaintiffs to show that common issues of law and fact predominate over issues affecting individual members. "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. This inquiry requires a court to differentiate between individual questions and common questions. *Tyson Foods, Inc. v.*

---

[3]        It is undisputed that class counsel is adequate under Rule 23(g).

*Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

> An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."

*Id.* (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–97 (5th ed. 2012)).  "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008), *as amended* (Jan. 16, 2009) (quoting *Newton*, 259 F.3d at 172).  If the essential elements are susceptible to class-wide proof, then "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Tyson Foods*, 136 S. Ct. at 1045 (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–24 (3d ed. 2005)); *see also In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020) (individual issues such as "allocating . . . damages" do not preclude class certification).  Importantly, a putative class need not prove the elements but instead "must demonstrate that its claims are *capable of common proof* at trial by a preponderance of the evidence."  *Lamictal*, 957 F.3d at 191; *see also Williams*, 837 F.3d at 322.

### (i)     Misclassification—ABC Test

Plaintiffs' wage-and-hour claims depend in part on showing that the putative class members were employees of AEX under New Jersey law.  That issue is governed under the so-called "ABC" test.  *Hargrove v. Sleepy's, LLC*, 106 A.3d 449, 463 (2015).  The "ABC" test presumes that an individual is an employee, as opposed to an independent contractor, unless the employer can show:

(A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

(B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

(C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.

*Id.* at 458 (quoting N.J.S.A. § 43:21–19(i)(6)).  If an employer fails to satisfy any of the above, then the individual is an employee.  *Id.*

### (a)    Prong A

Prong A "concerns the control exercised by the individual or business of the person retained to perform a remunerated task."  *Id.* at 464.  The alleged employer "must establish not only that the employer has not exercised control in fact, but also that the employer has not reserved the right to control the individual's performance."  *Carpet Remnant Warehouse, Inc. v. New Jersey Dep't of Labor*, 593 A.2d 1177, 1185 (N.J. 1991).  By the same token, "[t]he inquiry must examine not only the terms of the contract of agreement to provide services but also the facts of the employment.  In other words, the inquiry extends to all the circumstances attendant to the actual performance of the work."  *Hargrove*, 106 A.3d at 464.  Importantly, the "employer need not control every facet of a person's responsibilities . . . for that person to be deemed an employee."  *Carpet Remnant Warehouse*, 593 A.2d at 1185; *see also Hargrove*, 106 A.3d at 459 (same).  This inquiry is fact-intensive, requiring an evaluation of all the circumstances surrounding the employment relationship.  *See Hargrove*, 106 A.3d at 464.

Plaintiffs argue, and the Court agrees, that prong A is provable by common evidence.  (Mov. Br. at 35).  Specifically, Plaintiffs cite the uniform TBAs that couriers signed, the deposition

testimony of AEX leadership, and various corporate documents. (*Id.* at 9–18, 35). The totality of the evidence, which is common to all class members, is capable of proving that AEX's policy was to control how couriers carried out their services in the following ways: (1) that prior to hiring, AEX imposed various checks on couriers, such as background checks and drug testing (Maenner Dep. at 19–22, 36; Gamble Dep. at 64–67; Vetting Checklist; Vehicle Inspection Form); (2) that AEX trained couriers by requiring them to undergo route orientation (Wade Dep. at 22–25); (3) that AEX required couriers to report to the distribution centers (a) in the beginning of the workday to receive their daily manifests and sort through items and (b) at the end of the workday to return paperwork, items, and empty totes (Wade Dep. at 11–14, 34; Skrivanic Dep. at 9, 19–21); (4) that AEX devised the daily manifests, required couriers to make deliveries within 15 minutes of the scheduled delivery time, and did not permit couriers to make unauthorized stops while working on their daily manifests (Wade Dep. at 41–43; Kremper Dep. at 29–30; Skrivanic Dep. at 39–40; Carlin Dep. at 61, 66); (5) that AEX compiled its customers' security requirements and categorically imposed them on all couriers, even couriers who did not service a particular customer (Carlin Dep. at 27; Cust. Sec. Reqs.); and (6) that AEX enforced its requirements by conducting remote surveillance and field audits and by taking adverse actions against couriers for noncompliance (Wade Dep. at 56–61, 86–90; Kremper Dep. at 30–31, 33, 83–84; Skrivanic Dep. at 10–11; Gamble Decl. ¶ 9; Field Audit Checklist at D00224).

Although a factfinder may reach a contrary conclusion, the above facts are provable by common evidence that has been submitted in the record. Significantly, courts have found prong A provable by common evidence, and have also certified similar classes, after citing similar uniform agreements and company-wide policies. *See Portillo*, 336 F.R.D. at 95; *Carrow*, 2019 WL 7184548, at *10 (applying New Jersey law and collecting cases from other jurisdictions); *see*

*also Williams*, 837 F.3d at 321–22 (same but under Pennsylvania law).

AEX responds that New Jersey courts have found that "the putative employer exercises no control over the contractor where the company—as AEX does in this case—acts as a broker." (Opp. Br. at 17 (citing, *inter alia*, *Trauma Nurses, Inc. v. Bd. of Review, New Jersey Dep't of Labor*, 576 A.2d 285 (N.J. App. Div. 1990); *Koza v. New Jersey Dep't of Labor*, 660 A.2d 1231 (N.J. App. Div. 1995))). AEX acted as a mere broker, it argues, because it was so defined under the TBAs; the TBAs allowed couriers "to negotiate rates, accept or reject routes, obtain their own insurance, modify routes to maximize profitability, determine which route(s) to drive, hire or terminate employees, and terminate the TBAs at their discretion"; and any control AEX exercised was as a result of passing through its customers' preferences. (*Id.* at 18–19). The Court does not find this line of argument persuasive.

*First*, AEX's arguments invite the Court to rule on the merits. To certify a class, the movant need only "demonstrate that its claims are *capable of common proof* at trial by a preponderance of the evidence." *Lamictal*, 957 F.3d at 191. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Williams*, 837 F.3d at 322 (quoting *Amgen*, 568 U.S. at 466).

*Second*, AEX effectively concedes predominance by arguing that the uniform TBAs establish that none of its couriers was subject to its control. "When, as here, 'the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—[an alleged] failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification.'" *Tyson Foods*, 136 S. Ct.

at 1047 (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 107 (2009)).[4]  Indeed, "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 466.

The Court therefore finds that prong A is provable by common evidence.

### (b)     Prong B

An employer can satisfy prong B in one of two ways—by showing that such service is *either* "outside the usual course of the business for which such service is performed," *or* "is performed outside of all the places of business of the enterprise for which such service is performed."  *Hargrove*, 106 A.3d at 458 (quoting N.J.S.A. § 43:21–19(i)(6)).

AEX does not dispute that the first standard set out by prong B is provable by common evidence.  And it is.  That prong raises "fairly abstract" questions—"about the nature of the service provided, the usual course of business of the employer, and whether the service was performed at the employer's place of business"—that "do not vary by individual."  *Carrow*, 2019 WL 7184548, at *10; *accord Portillo*, 336 F.R.D. at 95.

Instead, AEX argues that it satisfies the second standard under prong B because couriers "unquestionably" performed services "outside of AEX's places of business, i.e., deliveries occur at customer sites."  (Opp. Br. at 20).  Going further, AEX repeats that it acted as a mere broker of delivery services, and that it is not itself a delivery company.  (*Id.*).  However, AEX's argument is one on the merits, and AEX supports the argument by citing common evidence.  Its argument thus does not present a basis to deny certification.  *See Tyson Foods*, 136 S. Ct. at 1047.

Moreover, common evidence is capable of refuting AEX's conclusion.  Specifically,

---

[4]     Moreover, the cases cited by AEX relied on evidence common to all punitive employees in finding they were not employees under New Jersey law.  *Trauma Nurses*, 576 A.2d at 290–92; *Koza*, 660 A.2d at 1234–35.

common evidence can prove that AEX was more akin to a delivery company than it was to a broker of delivery services.  If a factfinder reaches that conclusion, AEX cannot satisfy the second standard under prong B.  That standard "refers only to those locations where the enterprise has a physical plant or conducts an integral part of its business." *Carpet Remnant Warehouse*, 593 A.2d at 1190.  As the New Jersey Appellate Division has found, a company that transports good for its customers has "no fixed place" of business—services are "performed at any place within the prescribed area where defendants' customers were located." *Morales v. V.M. Trucking, LLC*, No. A-2898-16T4, 2019 WL 2932649, at *6 (N.J. App. Div. July 9, 2019) (cleaned up).

The Court therefore finds that prong B is provable by common evidence.

### (c)    Prong C

Prong C asks whether the individual is customarily engaged in an independently established trade, occupation, profession, or business.  The inquiry asks whether the employee has "an enterprise that exists and can continue to exist independently of and apart from the particular service relationship.  The enterprise must be one that is stable and lasting—one that will survive the termination of the relationship." *Hargrove*, 106 A.3d at 459 (quoting *Gilchrist v. Div. of Employment Sec., Dep't of Labor & Indus.*, 137 A.2d 29, 35 (N.J. App. Div. 1957)).  It "is satisfied when an individual has a profession that will plainly persist despite the termination of the challenged relationship." *Id.*  "[I]f the person providing services is dependent on the employer, and on termination of that relationship would join the ranks of the unemployed, the C standard is not satisfied." *Carpet Remnant Warehouse*, 593 A.2d at 1187.

Prong C, like prongs A and B, is provable by common evidence.  As Plaintiffs point out, common evidence can show that while couriers technically operated under separately incorporated entities, AEX exercised strict control over them, their routes, and their hours—rendering them

practically unable to work as delivery drivers absent their relationship with AEX. (Mov. Br. at 37).

AEX does not seriously dispute that common evidence can prove prong C. Instead, AEX raises a merits argument. (Opp. Br. at 20–23). AEX argues that prong C requires an alleged employer to "simply permit" an individual to work for another company during their contractual relationship. (*Id.* at 21). AEX further argues that the TBAs allowed Plaintiffs to do so because they could accept or reject routes, modify routes to maximize profits, obtain their own insurance, take time off without approval, use their vehicles and materials to perform services, and could negotiate rates. (*Id.* at 22). Finally, AEX argues that Plaintiffs' status as brokers would survive their relationship with AEX. (*Id.*).

But, again, AEX relies on common evidence to support its arguments. Moreover, other evidence common to all class members indicates that couriers did not have the practical ability to operate their own businesses independent of AEX. Evidence in the record suggests that AEX required couriers to report to a distribution center in the beginning of the workday and at the end, and that AEX forbid couriers, while delivering pursuant to the daily manifests, from making unauthorized stops on pain of termination. (Wade Dep. at 11–14, 34; Skrivanic Dep. at 9, 19–21; Cust. & Reg. Req.). As class members Sikorski and Oliveri attested, AEX required couriers to work full days, leaving them unable to perform other work. (Sikorski Decl. ¶¶ 7, 11, 16, 18, 19; Oliveri Decl. ¶¶ 7, 11, 16, 18, 19).

The Court therefore finds that prong C is provable by common evidence.

### (ii)   WPL—Unlawful Deductions

Plaintiffs claim that AEX violated the WPL, not simply by misclassifying them as independent contracts, but by withholding wages due to them as employees. The relevant language

20

of the WPL for this claim is in N.J.S.A. § 34:11-4.4.  In pertinent part, that section provides that an employer cannot "withhold or divert any portion of an employee's *wages*," unless (a) authorized under New Jersey and federal law or (b) for one of 11 enumerated purposes.  N.J.S.A. § 34:11-4.4(a)–(b) (emphasis added).  In determining whether AEX violated the WPL, "a trier of fact will decide (1) whether Defendants *withheld wages* from Plaintiff; (2) the purpose for withholding such wages; and (3) whether the purpose for withholding wages is one of the itemized reasons set forth in the []WPL."  *Snyder v. Dietz & Watson, Inc.*, 837 F. Supp. 2d 428, 445 (D.N.J. 2011) (emphasis added).

AEX does not dispute the latter two elements of Plaintiffs' unlawful deductions claim. More specifically, AEX does not dispute that, *if* it withheld wages from couriers' pay, the purpose the deductions were not authorized under N.J.S.A. § 34:11-4.4.  Instead, AEX argues that Plaintiffs have not shown that it withheld *wages*.  (Opp. Br. at 24).

The WPL defines "wages" as "the direct monetary compensation for *labor or services rendered* by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto."  N.J.S.A. § 34:11-4.1(c) (emphasis added).  Relying on that definition, AEX argues that it deducted certain expenses from an amount constituting "gross receipts," which was far greater than compensation for labor or services rendered.  (Opp. Br. at 26–28).  AEX's gross receipts argument is based on a provision of the TBA that says that the couriers' "fees for transportation services rendered shall be set forth in <u>Appendix B</u> and such fees shall constitute the total fees for everything furnished, provided, or done by CONTRACTOR in connection with this agreement, including driver's services."  (TBA ¶ 3).  AEX also points to several paragraphs of the TBA outlining the couriers' responsibility to pay various

21

expenses.  (*Id.* ¶¶ 5(a), 5(c), 5(d), 7, 11 & App'x C).

But like AEX's argument regarding the ABC test, its wages argument appears to advance "a fatal similarity," *Tyson Foods*, 136 S. Ct. at 1047—that the unlawful deductions claim fails for all class members because the uniform TBA clarifies that money was deducted from gross receipts, not wages.  AEX does not dispute that it identified thirty-six different deductions that it could take and generally did take from couriers' final pay.  (AEX's ROGs No. 11).  Nor does AEX dispute that it required couriers to take on expenses that are not required of statutory employees. *See Carrow*, 2019 WL 7184548, at *11 ("Further, they contend that Defendant indirectly took deductions from all class members by improperly placing the burden for certain expenses on them. If this legal theory holds up, then all class members have indeed suffered damages on a common basis.").

Therefore, predominance is satisfied with respect to Plaintiffs' WPL claim.

### (iii)    WHL—Overtime

Plaintiffs claim that AEX violated the WHL by withholding overtime pay due to them as "employees" for hours worked over 40 in a week.  The relevant language of the WHL for this claim is found in N.J.S.A. § 34:11-56a4.  In pertinent part, that section provides that "[a]n employer shall . . . pay each employee not less than 1 1/2 times such employee's regular hourly rate for each hour of working time in excess of 40 hours in any week."  N.J.S.A. § 34:11-56a4(b)(1); *see also Hargrove*, 106 A.3d at 458 ("The WHL establishes not only a minimum wage but also an overtime rate for each hour of work in excess of forty hours in any week for certain employees.").

Notably, Plaintiffs did not address whether they had common proof establishing a WHL violation in their opening brief.  And, while AEX admits it never paid overtime wages, AEX disputes that Plaintiffs have submitted common proof showing that the class members worked over

40 hours per week.  (Opp. Br. at 29–30, 39–40).  Moreover, AEX argues that Plaintiffs are required to submit such evidence because New Jersey law does not forbid misclassification alone.  (*Id.*).

The Court must agree.  Of the 754 class members, Plaintiffs submitted evidence of only six class members, themselves include.  Of the six, only three attested they had worked overtime. (Bedoya Dep. at 29–32, 35–37; Adu-Bekoe Decl. ¶ 20; Gonzales's ROGs No. 7).  That evidence is insufficient to support predominance.  Plaintiffs have not shown that *their* claim is provable by common evidence—evidence that an individual class member could rely upon to make out a prima facie case—or that this issue is susceptible to generalized, class-wide proof.  As a result, a factfinder would have to speculate to find that a randomly selected class member worked overtime, in excess of 40 hours per week, based on Plaintiffs' evidence concerning six of 754 class members.

Plaintiffs mainly raise two arguments in response.  The Court is not persuaded.

*First*, Plaintiffs argue that whether class members worked above 40 hours per week is an issue of damages, which does not need to be shown by common proof to certify a class.  (D.E. No. 143 ("Reply") at 6–7 (citing, *inter alia*, *Tyson Foods*, 136 S. Ct. 1036)).  But, as noted, the WHL does not forbid misclassification alone.  It requires employers to pay couriers overtime pay for every hour worked over 40 in a week.  *See* N.J.S.A. § 34:11-56a4(b)(1).  Thus, the question whether a courier worked over 40 hours addresses an essential element of the cause of action.  *See Espinal v. Bob's Disc. Furniture, LLC*, No. 17-2854, 2021 WL 5002650, at *6 (D.N.J. Oct. 28, 2021) (limiting class definition to drivers and helpers who worked more than 40 hours per week because "[w]ithout such a limitation, the putative class includes drivers and helpers who do not qualify for overtime compensation under the NJWHL").  In contrast, the amount of overtime pay to which each class member may eventually be entitled is the type of damages issue that need not be addressed at the class certification stage.  *See Harnish v. Widener Univ. Sch. of Law*, 833 F.3d

298, 306 (3d Cir. 2016) ("'While obstacles to calculating damages may not preclude class certification, the putative class must first demonstrate economic loss'—that is, the fact of damage—'on a common basis.'" (quoting *Newton*, 259 F.3d at 189)).

Notably, one of the issues in *Tyson Foods*, 136 S. Ct. 1036—the case most heavily relied upon by Plaintiffs—was whether an expert's analysis of representative data concerning the hours worked of employees "could have been used to establish liability in an individual action." *Id.* at 1048.  If so, the employees submitted common proof of an essential element—that they worked over 40 hours a week—in their unpaid overtime case.  *Id.*  *Tyson Foods* held that the expert's analysis of representative data was sufficient.  But unlike the plaintiffs in *Tyson Foods*, and as explained above, Plaintiffs here did not submit representative proof that couriers worked overtime.  Instead, Plaintiffs merely submitted evidence concerning six of 754 class members.  And only three of the six indicated that they worked overtime.

This case is thus similar to *Ferreras v. American Airlines, Inc.*, 946 F.3d 178 (3d Cir. 2019).  There, the Third Circuit reversed the District Court's decision to grant class certification in an unpaid overtime case brought under New Jersey's WHL.  The Third Circuit distinguished *Tyson Foods* on the basis that the "record evidence . . . demonstrates that employees were not always working while clocked in and there was substantial variability in what they were doing, even if some of it could be called work."  *Id.* at 186–87.  Said another way, the record in *Ferreras* did not contain representative proof that employees worked overtime.  Thus, "the employees would need individualized, not representative, evidence to prove their case."  *Id.* at 187.

*Second*, Plaintiffs argue that they only need to show by a "just and reasonable inference" that they worked over 40 hours per week because AEX violated its statutory duty to record its employees' hours.  (Opp. Br. at 9–10).  Plaintiffs satisfy that standard, they claim, because they

can rely on the data from the couriers' handheld scanners to establish the hours that they made deliveries and could "supplement" the data with representative evidence.  (*Id.* at 8, 10).

Plaintiffs are correct that the just-and-reasonable-inference standard likely applies if they are employees as opposed to independent contractors.  *See Tyson Foods*, 136 S. Ct. at 1047; *Hargrove v. Sleepy's LLC ("Hargrove II")*, 974 F.3d 467, 482 (3d Cir. 2020) (extending the "just and reasonable inference" standard to ascertainability of class in action asserting violations of New Jersey's WHL and WPL).  However, that standard does not extinguish a plaintiff's burden to produce sufficient evidence at the class certification stage.  *Tyson Foods*, 136 S. Ct. at 1047 ("[A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he *produces sufficient evidence* to show the amount and extent of that work as a matter of just and reasonable inference." (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)) (emphasis added)); *Hargrove*, 974 F.3d at 482 (noting that when plaintiffs rely on the "just and reasonable inference" standard, "it remains their burden" to produce sufficient evidence).  Class certification entails a rigorous analysis, *Dukes*, 564 U.S. at 350–51, and Plaintiffs have not actually submitted the evidence that they propose.

Moreover, Plaintiffs do not specify whether data from the couriers' handheld scanners still exists.  Nor do they specify what type of representative evidence they would rely on.  They cite several cases relying on representative evidence to establish violations of the Federal Labor Standards Act for failure to pay overtime, but those cases involved plaintiffs who *actually submitted* the evidence—and the evidence far more robust than what Plaintiffs submitted in the record.  In those cases, the plaintiffs submitted expert testimony or some combination of testimony of several members of the collective action, testimony of the employer's managers, and/or payroll records.  *See Tyson Foods*, 136 S. Ct. at 1046–49 (expert testimony); *Pierce v. Wyndham Vacation*

*Resorts, Inc.*, 922 F.3d 741, 748 (6th Cir. 2019) (testimony of 43 of 145 similarly situated salespersons and several of the employer's managers); *Monroe v. FTS USA, LLC*, 860 F.3d 389, 394, 410–11 (6th Cir. 2017) (payroll records and the testimony of 17 of 293 similarly situated technicians and several of the employer's managers); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1276–80 (11th Cir. 2008) (extensive payroll records, corporate manuals, 39 witnesses who were part of the employers' managerial staff); *Stillman v. Staples, Inc.*, No. 07-849, 2009 WL 1437817, at *15–16 (D.N.J. May 15, 2009) (testimony 13 of 342 plaintiffs and several corporate officials); *McLaughlin v. DialAmerica Marketing, Inc.*, 716 F. Supp. 812, 825–26 (D.N.J. 1989) (expert testimony and testimony of 43 plaintiffs); *see also United States ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*, 5 F.4th 315, 353 (3d Cir. 2021) (finding, in a Davis-Bacon and False Claims Act case, that testimony of six witnesses "about the work of 22 of the 42 affected groundmen and laborers (*i.e.*, a 52-percent sample)" was appropriately representative); *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 377 (7th Cir. 2015) ("In this case the district court sifted through voluminous evidence that pointed to a common question as to whether PNC had an unwritten practice or policy that required employees class-wide to work off-the-clock overtime hours."). Nothing remotely close to the evidence submitted in those cases has been submitted in this case.

For the above reasons, the Court finds that predominance is not satisfied on this record with respect to Plaintiffs' claim under the WHL.[5]

---

[5]     Alternatively, the Court could exercise its inherent authority to redefine the putative class, limiting the class to couriers who actually worked over 40 hours per week. *See Espinal*, 2021 WL 5002650, at *6 (exercising such authority). However, doing so might raise other issues for the class, such as ascertainability. *Id.* at *9 (declining to certify similarly redefined class due to ascertainability issues).

The Court notes, however, that Plaintiffs remain free to move to alter or amend under Rule 23(c)(1)(C) after obtaining additional evidence supporting certification. *See Hargrove II*, 974 F.3d at 476.

### (iv)     Unjust Enrichment

The Court will not certify Plaintiffs' unjust enrichment claim.  They do not pursue certification of that claim in their opening brief, and AEX points out that a claim of unjust enrichment requires an individualized fact-intensive inquiry under New Jersey law.  (Opp. Br. at 30–32).  An "unjust enrichment claim inherently demands an individualized inquiry, because it requires a showing that the plaintiff performed services in good faith, that the defendant accepted those services, and that the plaintiff had a reasonable expectation of compensation."  *Merlo v. Federal Express Corp.*, No. 07-4311, 2010 WL 2326577, at *7 (D.N.J. June 7, 2010).  Plaintiffs do not respond to this contention in their reply brief.  They have therefore failed to satisfy their burden under Rule 23.

### F.     Superiority

Under Rule 23(b)(3), the party seeking certification must show superiority—"that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "Rule 23(b)(3)'s superiority requirement 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'"  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 434 (3d Cir. 2016), *as amended* (May 2, 2016) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 (3d Cir. 2004)).  "Rule 23(b)(3) sets out several factors relevant to the superiority inquiry."  *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998).  Those are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).

All four factors favor certification. First, the individual class members' interests in controlling prosecution of this case are slight in comparison to the costs they would incur from footing the bill for discovery and motions practice. *Warfarin Sodium*, 391 F.3d at 534 ("However, individual consumer class members have little interest in 'individually controlling the prosecution or defense of separate actions,' Fed. R. Civ. P. 23(b)(3)(A), because each consumer has a very small claim in relation to the cost of prosecuting a lawsuit."). Second, the Court is not aware of any pending individual action concerning any member of the proposed class. One class member filed his own putative class action on May 6, 2020, in *Wereme v. AEX*, No. 20-5616, but that action has since been voluntarily dismissed. Third, concentrating this litigation in this District and vicinage is desirable because the action arose from facts occurring in New Jersey. *See Williams v. Sweet Home Healthcare, LLC*, 325 F.R.D. 113, 130 (E.D. Pa. 2018). Fourth, the Court perceives no difficulties in managing this action as a class.

AEX argues that superiority is not satisfied because "each class member would be required to litigate numerous and substantial issues to establish liability." (Opp. Br. at 39). However, with respect to Plaintiffs' WPL claim, and for the reasons stated above, the Court disagrees.

Accordingly, superiority is satisfied as to Plaintiffs' WPL claim.

### G.    Ascertainability

To obtain class certification under Rule 23(b)(3), the plaintiff must "prove by a preponderance of the evidence that the class is ascertainable." *Byrd*, 784 F.3d at 163. "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with

reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'"  *Id.* (quoting *Hayes*, 725 F.3d at 355).  "However, a plaintiff need not be able to identify all class members at class certification—instead, a plaintiff need only show that class members can be identified." *Hargrove II*, 974 F.3d at 477 (cleaned up).

The proposed class here consists of all persons who executed a TBA to perform courier services for AEX, either personally or on behalf of a corporate entity, and worked for AEX as a courier at any time from May 1, 2008, to the present in the State of New Jersey. The proposed class meets the first requirement of ascertainability because it is not based on a legal conclusion but rather on whether the class member signed a TBA, performed courier services, and worked for AEX during the relevant class period during which AEX subjected couriers to the corporate policies outlined above.  The proposed class also meets the second requirement of ascertainability. As Plaintiffs point out, AEX has already identified 754 couriers who fall within the proposed class, indicating that AEX has the necessary records to reliably and feasibly determine class membership. (Mov. Br. at 28).  *See Hargrove II*, 974 F.3d at 480 ("In *Byrd*, for example, we held that the household class members were ascertainable even though no evidence as to them had been submitted because we could imagine the types of evidence that could be identified and used to link the existing class members to household members.  784 F.3d at 170–71.").

AEX argues that the class definition is too broad because it makes no attempt to limit class membership to those who received unlawful deductions.  (Opp. Br. at 34–35).  The Court disagrees for the same reasons it finds that factor not fatal to predominance.  AEX does not dispute that it identified thirty-six different deductions that it could make and generally did make from couriers' final payments.  AEX does not cite any evidence suggesting that some couriers received lawful

deductions while others received unlawful deduction.  Instead, AEX disputes that *any* courier received an unlawful deduction.  That type of merits argument is not appropriate here.  Moreover, even if some couriers in the proposed class did not receive unlawful deductions, the Court will be able to address that issue if and when it must allocate damages.  AEX has offered no reason to believe that number would be more than *de minimis*, and "a class can still be ascertainable even if it may be slightly overbroad."  *See Hargrove II*, 974 F.3d at 481.

Accordingly, ascertainability is satisfied with respect to Plaintiffs' WPL claim.[6]

## IV.    CONCLUSION

For the above reasons, Plaintiffs' motion for class certification (D.E. No. 136) is **GRANTED in part** and **DENIED in part**.  An appropriate Order will be entered.

Dated: August 17, 2022

**Hon. Esther Salas, U.S.D.J.**

---

[6]    The Court does not address whether the proposed class is too broad with respect to the WHL claim, see *supra* note 5, or the unjust enrichment claim.  Nor does the Court address superiority for either claim.